**ORAL ARGUMENT NOT YET SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

|  |  |
|---|---|
| STATE OF TEXAS, *et al.*,<br><br>    *Petitioners*,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,<br><br>    *Respondents.* | No. 24-1054 (consolidated with Nos. 24-1059; 24-1101; 24-1103) |

**INTERVENOR PETITIONER CONTINENTAL RESOURCES, INC.'S
RESPONSE IN SUPPORT OF MOTION TO STAY**

CONTINENTAL RESOURCES, INC.

Paul M. Seby
Greenberg Traurig, LLP
1144 15th Street, Suite 3300
Denver, CO 80202
(303) 572-6500 - Telephone
(303) 572-6540 - Facsimile
sebyp@gtlaw.com

***Counsel for Intervenor Petitioner
Continental Resources, Inc.***

# TABLE OF CONTENTS

TABLE OF CONTENTS ...............................................................i

TABLE OF AUTHORITIES..........................................................iii

GLOSSARY OF TERMS .............................................................v

INTRODUCTION ...................................................................1

ARGUMENT .........................................................................1

   I.   The Presumptive Emission Standards in the Final Rule Violate the Clean Air Act and Irreparably Harm Operators Like Continental. ......................................................2

      A.   The Final Rule's presumptive emission standards violate Section 111(d) of the Clean Air Act. ........................2

      B.   The Final Rule's presumptive emission standards implicate serious reliance interests for Continental............5

   II.   The Final Rule's Prohibition on Flaring Associated Gas Violates the Clean Air Act..........................................7

   III. A Stay is Necessary to Prevent Immediate and Irreparable Harm to Operators Like Continental. ......................................10

      A.   EPA's BSER determination for associated gas is arbitrary and capricious....................................................11

      B.   The Final Rule's required feasibility studies for associated gas flaring are arbitrary and capricious...........12

      C.   The Final Rule's prohibition on flaring associated gas imposes immediate irreparable harms on Continental. ..................................................................13

      D.   The net heating value monitoring requirements in the Final Rule are also arbitrary and capricious because they are technically infeasible and impossible to meet. ...................................................................15

i

IV. The Final Rule's Super Emitter Program is Unlawful under the Clean Air Act, Beyond EPA's Statutory Authority, and Will Cause Immediate and Irreparable Harms to Continental. .................................................. 17

    A.   The Super Emitter Program exceeds EPA's authority under the Clean Air Act. ................................................... 17

    B.   The Super Emitter Program will cause immediate irreparable harm to Continental. ........................................ 19

CONCLUSION ....................................................................... 22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atlas Air, Inc. v. Int'l Bhd. of Teamsters*,
   280 F. Supp. 3d 59 (D.D.C. 2017), *aff'd*, 928 F.3d 1102
   (D.C. Cir. 2019) ...................................................................... 20

*D.C. Transit Sys., Inc. v. Washington Metropolitan Area
   Transit Comm'n*,
   466 F.2d 394 (D.C. Cir.), *cert. denied,* 409 U.S. 1086, 93
   S.Ct. 688, 34 L.Ed.2d 673 (1972) ......................................... 15

*DHS v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020) ..................................................... 6, 7

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016) ............................................................. 6

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 .............................................................................. 6

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ............................................................... 18

*Perot v. Federal Election Comm'n*,
   97 F.3d 553 (D.C. Cir. 1996) ............................................... 18

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) ................................................................. 1

*West Virgnia v. EPA*,
   597 U.S. 697 (2022) ................................................................. 8

**Statutes**

42 U.S.C. 7411 .................................................. 2, 3, 4, 5, 7, 8, 10, 17, 20

42 U.S.C. § 7410 ......................................................................... 4

42 U.S.C. § 7414 .............................................................. 17, 18, 19

42 U.S.C. § 7602 ......................................................................... 4

42 U.S.C. § 7604 .............................................................. 18, 19

**Other Authorities**

86 Fed. Reg. 63,110 (Nov. 15, 2021)....................................................6, 10

89 Fed. Reg. 16,820 (March 8, 2024) .... 1, 2, 7, 8, 9, 11, 13, 14, 16, 17, 19, 21, 22

## GLOSSARY OF TERMS

| | |
|---|---|
| BSER | Best System of Emission Reduction |
| CAA | Clean Air Act |
| EPA | Environmental Protection Agency |
| Final Rule | "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review," 89 Fed. Reg. 16,820 (Mar. 8, 2024) |

**INTRODUCTION**

Intervenor Continental Resources, Inc. ("Continental") submits this brief in response to and support of Petitioners' – 24 States and one state legislature ("Movant States") – motion to stay ("Movant States' Motion) the Environmental Protection Agency's ("EPA's") final rule entitled *Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review*, 89 Fed. Reg. 16,820 (March 8, 2024) ("Final Rule").  Doc. No. 2049412.  The Court extended the deadline to respond to the Motion to Stay through May 6, 2024.  Doc. No. 2050549.

**ARGUMENT**

To avoid duplicative argument, Continental adopts and incorporates the arguments as set forth in the Movant States' Motion.  In further support of the Movant States' Motion, Continental provides the following argument and declaration of Sean Flynn, the Vice President of Health, Safety, and Environmental at Continental.  Attachment 1, hereto.

A stay is necessary to prevent irreparable harm to Continental.  Neither the cost of compliance with the Final Rule nor the additional irreparable harms caused by the Final Rule can be remedied later through the recovery of money damages.  *See Thunder Basin Coal Co. v. Reich,* 510 U.S. 200, 220-221 (1994) (Scalia J., concurring in part) ("[C]omplying with a regulation later held invalid almost always

1

produces the irreparable harm of nonrecoverable compliance costs."). The Final Rule is unlawful and should be stayed.

## I. The Presumptive Emission Standards in the Final Rule Violate the Clean Air Act and Irreparably Harm Operators Like Continental.

Movant States' criticisms of EPA's "presumptive standards" (89 Fed. Reg. at 16,828) highlight the significant problems and immediate harms that the Final Rule also imposes on operators such as Continental. Continental has long planned and invested substantial economic and human resources in its existing operations in reliance on state requirements, and EPA's unlawfully rigid "presumptive standards" in the Final Rule will, as the Movant States' point out, tie the states hands and remove all operational flexibility in state regulations applying to such existing sources.

### A. The Final Rule's presumptive emission standards violate Section 111(d) of the Clean Air Act.

The Final Rule's presumptive emission standards violate the statutory structure of the Clean Air Act ("CAA") because they impose mandatory nationwide one-size-fits-all presumptive emissions standards that leave the states no flexibility in regulating existing sources contrary to the cooperative federalism required by CAA Section 111(d).

Section 111(a)(1) of the CAA defines the "standards of performance" for new and existing stationary sources and the "best system of emission reduction"

("BSER") that EPA establishes and that states then apply to promulgate standards of performance for existing sources, taking into account state-specific facts and circumstances. 42 U.S.C. 7411(a)(1). Section 111(d) implements the CAA's cooperative federalism approach to existing sources by requiring EPA to "establish a procedure" for states to submit Section 111(d) plans that "establish[] standards of performance for [certain] existing source for any air pollutant[s]." 42 U.S.C. 7411(d)(1).

Under Section 111(d), EPA may not set emission reduction requirements for states or existing sources. Instead, EPA is only authorized to "establish a procedure" for States to submit plans containing state performance standards applying EPA's BSER guidelines. 42 U.S.C. § 7411(d)(1). EPA then reviews state plans to determine if the states' performance standards are "satisfactory" based on the BSER guidelines (not mandates) established by EPA. *Id.* at (d)(2)(A).

A "standard of performance" is "a standard for emissions of air pollutants which reflects the degree of emission limitation *achievable*" by applying the "best system of emission reduction . . . taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements [EPA] determines has been *adequately demonstrated*." *Id.* at (a)(1) (emphasis added). The BSER set by EPA is not an "emission limitation," which is a "requirement established by the State or the [EPA] which limits the quantity, rate,

3

or concentration of emissions of air pollutants on a continuous basis, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction, and any design, equipment, work practice or operational standard promulgated under this chapter."  42 U.S.C. § 7602(k).

While EPA creates the BSER, the achievable emission limitation for existing sources is established by states through their State Implementation Plans ("SIPs"), not EPA.  Section 111(d)(1) requires EPA to "establish a procedure similar to that provided by section 7410 of this title under which each State shall submit to [EPA] a plan which (A) establishes standards of performance for any existing source for any air pollutant . . ."   42 U.S.C. § 7411(d)(1).  Further, the "[r]egulations of the Administrator under this paragraph shall permit the State in applying a standard of performance to any particular source under a plan submitted under this paragraph to take into consideration, among other factors, the remaining useful life of the existing source to which such standard applies."  *Id*.  Thus, for existing sources, states have the primary authority to establish the standards of performance in their SIPs (i.e., the achievable emissions limitations, applying EPA's BSER guidelines), subject to EPA review and approval of the SIPs.  Further, Congress specifically requires that states be able to consider source-specific factors when establishing those achievable emission limitations (i.e., standards of performance).

4

Under Section 111(d)(1), EPA does not have the authority to impose binding national emission limitations for existing sources that states are then required to implement through local controls. EPA instead is only authorized to "establish a procedure" (42 U.S.C. § 7411(d)(1)) for states to follow when the states create their SIPs containing performance standards based on EPA's BSER. EPA's BSER are guidelines, not binding emission limitations on the states or existing sources, because Section 111(d) is explicit that it is the states, not EPA, that establish the binding standards of performance for existing sources. This is reflected in the title of the Final Rule, which is captioned as "emission guidelines for existing sources."

The Final Rule is fatally flawed because it leaves states no real choice with regard to the control measures options available to them chiefly because the Final Rule contains EPA's inflexible national "presumptive standards" governing existing sources. Doc. No. 2049412 at 8-10. The Final Rule's usurpation of clear state statutory authority imposes immediate irreparable harm on operators such as Continental who have planned and developed their operations for existing sources in reliance on the flexibility and options already encompassed in state regulations. Attachment 1 at ¶¶8-33.

### B. The Final Rule's presumptive emission standards implicate serious reliance interests for Continental.

The presumptive emission standards in the Final Rule adversely affect material reliance interests for oil and gas operators across the country, including

Continental.  Over the course of decades, Continental has invested, planned, and developed its operations based on the longstanding application of *state* regulations to its existing operations.  Attachment 1 at ¶8.  The Final Rule turns that substantial reliance on its head, and now requires Continental to immediately begin the time consuming and costly process of adjusting its existing operations to meet the Final Rule's presumptive one-size-fits-all standards (which the Movant States' point out are likely to be imposed because EPA has ominously warned that "it would likely be difficult for States to demonstrate that the presumptive standards are not reasonable for the vast majority of designated facilities." Doc. No. 2049421 at 8-9 (citing 86 Fed. Reg. 63,110, 63,251 (Nov. 15, 2021))).   Attachment 1 at ¶11.

When an agency changes policy (as EPA does with the Final Rule), it must "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Encino Motorcars, LLC v. Navarro* , 136 S. Ct. 2117, 2126 (2016),  (quoting *FCC v. Fox Television Stations, Inc.* , 556 U.S. 502, 515) (2009)).  Accordingly, an agency must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns."  *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020).  If an agency changes its policy despite reliance interests, it must provide a "reasoned explanation" therefor.  *Id.* at 1916.

6

EPA has not provided a reasoned explanation for its decision to create presumptive federal emissions standards in the Final Rule for existing sources, thereby departing from the longstanding practice and cooperative federalism required by CAA Section 111(d) to allow the *states* to establish standards of performance in their SIPs. This creates significant operational harms for Continental. For example, under the presumptive standards Continental will no longer be able to rely on considerations such as remaining useful life of its facilities (*see* Doc. No. 2049421 at 9-10), or which tank batteries are covered facilities (*id.* at 10-11) which Continental planned for in developing and constructing its existing operations.

## II. The Final Rule's Prohibition on Flaring Associated Gas Violates the Clean Air Act.

The Final Rule unlawfully prohibits the flaring of emission of "associated gas," which is defined as "the natural gas from wells operated primarily for oil production." 89 Fed. Reg. at 17,129. As noted above, the standards of performance set by EPA must reflect "the degree of emission limitation *achievable*" by applying the "best system of emission reduction . . . taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements [EPA] determines has been *adequately demonstrated*." 42 U.S.C. § 7411(a)(1) (emphasis added). CAA Section 111 does not authorize EPA to impose a *prohibition* on an emission source, but instead to identify the best system of

emission *reduction*.  *See* 42 U.S.C. § 7411(a)(1); *see also West Virginia v. EPA*, 597 U.S. 697, 728 (2022) (acknowledging EPA's longstanding view that under CAA Section 111 EPA's role was limited to ensuring the efficient pollution performance of each individual regulated source and that "if a source was already operating at that level, there was nothing more for EPA to do.").

Under section 60.5377b of the Final Rule, flaring of associated gas for *existing* sources constructed or modified after December 6, 2022 and all new sources is prohibited.  *See* 89 Fed. Reg. at 17,053 (§ 60.5377b).  Under section 5377b, operators at an associated gas well and affected facility are only given four options for dealing with associated gas (1) routing (recovering) the gas into a sales line; (2) using the gas onsite as a fuel source; (3) using the gas for another useful purpose; or (4) reinjecting the recovered gas into the well or another well.

None of these options in the Final Rule involve actual emissions control; instead, they require operators to recover the associated gas by routing it elsewhere. Common control device options for reducing gas emissions (e.g. other potential BSER) include flaring, thermal oxidation, and catalytic incineration.  Attachment 1, at ¶19.  In the Final Rule, EPA entirely failed to establish a BSER (emission control standard) for associated gas (let alone demonstrate that the emission control standard was "achievable" and "adequately demonstrated"), instead mandating that associated gas be fully recovered.  EPA claims in the Final Rule that the routing of

associated gas to a sales line *is the BSER*, a nonsensical conclusion. Routing to a sales line is not a system of emission reduction; it is a system of emission *prohibition*.

The fact that the Final Rule allows wells constructed between December 6, 2022, and May 7, 2026, to "route the associated gas to a control device that reduces methane and VOC emissions by at least 95.0 percent" (89 Fed. Reg. at 17,053 (§ 60.5377b(b) and (c)) if the operator can demonstrate and certify technical infeasibility of the four options (sale, onsite fuel, another useful purpose, or injection) for handling associated gas, does not remedy the Final Rule's prohibition on flaring associated gas and failure to select an adequately demonstrated and cost effective BSER control technology. The demonstration required by section 60.5377b(g) is as to *technical* feasibility only and does not allow operators to make any considerations as to the costs of the four prescribed options. *See* 89 Fed. Reg. at 16,951 ("The EPA disagrees that economic feasibility is a valid criterion on which to allow routine flaring or routing to control as part of the standard . . . the EPA has already considered costs when setting the standard. As such, there is no reason to allow for the type of 'economic feasibility' showing that commenters are requesting."). EPA's refusal to allow economic feasibility determination in the Final Rule mandates that operators such as Continental bear exorbitant costs, even when routing to an associated sales line is economically infeasible. Further, EPA did not

actually consider costs of alternative control technologies, instead solely analyzing a control prohibition (routing to a sales line) and comparing it to the cost of flaring, while failing to conduct a cost analysis of other potential technologies such as enclosed combustion devices, thermal oxidizers, catalytic incinerators, and deep well injection. *See Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review*, 86 Fed. Reg. 63,110 (Nov. 15, 2021) ("Nov. 2021 Proposal") at 63,237-63,238.

EPA's refusal to consider the of costs of alternative control technologies in selecting its BSER violates the CAA which mandates that the BSER selected by EPA must allow "taking into account the cost of achieving such reduction." 42 U.S.C. § 7411(a)(1). Under the Final Rule, operators such as Continental must now fully recover associated gas without flaring (unless it is technically impossible), without regard to the cost of such recovery.

## III. A Stay is Necessary to Prevent Immediate and Irreparable Harm to Operators Like Continental.

The Final Rule is based on significant arbitrary and capricious decision-making in regards to the standards of performance for *new* sources. The Final Rule's prohibition on flaring associated gas, net heating value monitoring requirements, and control device flow measurement and monitoring requirements will immediately and irreparably harm Continental's operations.

10

## A. EPA's BSER determination for associated gas is arbitrary and capricious.

EPA's BSER determination prohibiting flaring of associated gas in the Final Rule is arbitrary and capricious because it relies on data from large emissions sources that (1) are already more likely to be routed into sales lines; and (2) constitute allowable emissions event under the Final Rule as they reflect venting during periods of gathering system interruptions. Essentially, EPA's cost benefit analysis is based on non-representative emissions that will be captured without regulatory intervention or are allowable under the Final Rule.

In the Final Rule, EPA explains that its cost analysis of routing associated gas to a sales line was based upon "GHGRP subpart W data" but admits that "[e]xplanations of the specific causes of emissions are not provided in the GHGRP subpart W outputs." 89 Fed. Reg. at 16,941. Without consideration of the actual reasons gases were being flared, EPA arbitrarily chose to exclude small sources of gas emissions and instead focused their analysis on larger sources. *Id.* (EPA stating it "assumed that the low emitting situations likely represent instances where venting was only temporary, and thus we discounted their contribution to the representative emissions level.")

In reality, however, larger sources are exactly the ones where gas will be intentionally captured and sold as a product, while smaller sources of gas emissions are more likely to be the type of associated gas sources that would not normally be

11

captured and whose capture should have been evaluated for cost-effectiveness. Attachment 1 at ¶¶28-31. It is also likely that the largest reported sources of emissions considered by EPA are from temporary flaring of the largest gas-producing wells during periods of gathering system interruption. *Id.* at ¶30. Thus, the data EPA relies upon to justify its prohibition on flaring does not represent emissions reductions that will actually occur under either current regulations or the Final Rule. *Id.* EPA's cost calculations for the BSER for prohibiting the emissions of associated gas are thus arbitrary and capricious because they take "credit" for emissions reductions from larger sources that will either occur regardless of the Final Rule or are allowable under the Final Rule, while ignoring the actual costs for routing gas to a sales line at smaller operations where actual emissions reductions are likely to occur. *Id.* at ¶31.

### B. The Final Rule's required feasibility studies for associated gas flaring are arbitrary and capricious.

For operators such as Continental to avoid the onerous requirements to route associated gas to a sales line, the Final Rule requires that operators prove to EPA that it is "technically infeasible" to: (1) route into a gas gathering flow line or collection system to a sales line, (2) recover from the separator and use as an onsite fuel source, (3) recover from the separator and use for another useful purpose that a purchased fuel, chemical feedstock, or raw material would serve, or (4) recover from the separator and reinject into the well or injected into another well." 89 Fed. Reg.

at 16,887.  EPA admits that the third prong – proving that there is no other useful purpose for the associated gas – is unbounded.  *Id.* ("The final rule does not specify the 'other useful purpose' solutions that must be evaluated, but it is the responsibility of the owner and operator, along with the qualified professional  . . . to ensure that the list of options evaluated is comprehensive to address technically viable solutions.").  This language is so vague that an unlimited amount of "useful purposes" would have to be evaluated to effectively demonstrate technical infeasibility, giving EPA unbound discretion to deny any such demonstration.  It gives no clarity to operators such as Continental, who must submit any technical infeasibility analyses to EPA who will determine if the "useful purposes" evaluated are sufficiently "comprehensive."

This inability to create a suitable technical feasibility demonstration will prevent Continental and other operators from effectively being able to develop new and existing oil and gas assets.  This will lead to limits on production, the loss of leaseholds, and damage to artificial lift equipment, resulting in the reduction of royalty payments and related tax revenue owed to royalty owners, the states, and to the federal government.  Attachment 1 at ¶33.  This will also lead to delays in development and construction activities as operators are forced to wait on midstream providers to complete their infrastructure development or upgrades.  *Id.* at ¶32.

### C. The Final Rule's prohibition on flaring associated gas imposes immediate irreparable harms on Continental.

13

The Final Rule's prohibition on flaring associated gas causes immediate and irreparable harm to Continental. Continental will be required to shut in or curtail existing wells starting May 7th (the effective date of the Final Rule) until it can make a technical infeasibility determination or the midstream company provides pipelines to such wells with sufficient capacity to accept the associated gas.

EPA's clarification that gas emissions from "wildcat" or "delineation" wells are not considered associated gas (*see* 89 Fed. Reg. at 16,940) does not remedy the problem for wells with "stranded gas" (e.g. associated gas without access to a sales line (for economic or infrastructure reasons) or the ability to be applied to other beneficial uses (due to the low quality of the gas)). The result of this prohibition is that emissions of stranded gas from oil wells is not allowed (i.e., if it cannot be flared, sold, or used, and no other emission control is authorized, then there is no legal way to handle it when it is separated from the well stream). As such, the Final Rule effectively requires cessation of oil production at wells having stranded gas.

While Continental strives to develop only in areas where wells produce gas that has beneficial use, oil and gas exploration and production is not an exact science and occasionally Continental operates wells that produce stranded gas. Attachment 1 at ¶¶16-18. This includes instances when Continental drills modern horizontal wells in areas with existing legacy production where there is not existing or suitable gas takeaway pipelines. *Id.* at ¶22. In Continental's experience, midstream

14

providers will not provide or invest in sales gas takeaway infrastructure until after an operator can prove sufficient volumes of associated gas will be produced to make the investment economically feasible. *Id.* at ¶24. In effect, this will require Continental to shut-in or curtail operations until takeaway infrastructure and capacity is provided by a midstream operator, all while Continental is subject to contractual obligations from investors to produce the well – an untenable alteration of contractual and business operations plainly evident to (but disregarded by) EPA. *Id.* at ¶27. Further, there are frequently situations where a well will produce more associated gas than anticipated, such that existing gas takeaway capacity cannot handle the associated gas volumes, again requiring shut-in or curtailment under the Final Rule. *Id.* at ¶17.

### D. The net heating value monitoring requirements in the Final Rule are also arbitrary and capricious because they are technically infeasible and impossible to meet.

The Final Rule imposes net heating value ("NHV") monitoring requirements for new sources that are impossible to meet, rendering the rule arbitrary and capricious. Impossible requirements imposed by an agency are *per se* unreasonable: "Conditions imposed by [the] order are . . . unreasonable by virtue of being impossible to meet." *D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n,* 466 F.2d 394, 402 (D.C. Cir.), *cert. denied,* 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972).

15

Section 60.5417b of the Final Rule requires operators to "[c]ontinuously monitor or collect a sample of the inlet gas to the enclosed combustion device or flare twice daily to determine the average NHV of the gas stream for 14 consecutive operating days." 89 Fed. Reg. at 17,105. The continuous monitoring or one-hour sampling imposed by the Final Rule are infeasible given the intermittent flow to control devices. Attachment 1 at ¶37. Flow to the control device may occur for as little as a few minutes making continuous monitoring or collection of a single one-hour sample impossible, let alone 28 one-hour samples as required by the Final Rule. *Id.*

Further, Continental estimates that it has at least 150 devices on existing sources that will be subject to these monitoring requirements on May 7, 2024. Attachment 1 at ¶36. For these 150 sources to become compliant, Continental estimates it will require at least 79 days to conduct the required sampling. *Id.* at ¶38. It was, therefore, never possible for Continental to complete the NHV requirement during the 60-day compliance window of the Final Rule.

Further complicating the NHV requirement, SPL Inc., a leading provider of compliance and testing services for the oil and gas field, issued a public letter to EPA stating that the "amount of additional natural gas samples this requirement will result in is vastly greater than the capacity that laboratories have to collect and process such samples in the 60-day window" from the publication date of the Final Rule to

16

the May 7th effective date of the Final Rule. *Id.* at ¶¶41-43. Thus, even if Continental could complete the NHV sampling, it would not have the results from a laboratory in time to be compliant with the Final Rule, rendering it arbitrary and capricious.

IV. **The Final Rule's Super Emitter Program is Unlawful under the Clean Air Act, Beyond EPA's Statutory Authority, and Will Cause Immediate and Irreparable Harms to Continental.**

A. **The Super Emitter Program exceeds EPA's authority under the Clean Air Act.**

EPA claims its authority to delegate its monitoring authority to third parties under the "Super Emitter Program" in the Final Rule "is based on EPA's authority under CAA section 114(a) to require 'any person who owns or operates an emission source' (except mobile sources) to provide information necessary for purposes of carrying out the CAA and its authority to regulate sources under CAA Section 111." 89 Fed. Reg. at 16,877. CAA Section 114(a) establishes reporting requirements to EPA on *owners or operators* of emissions sources. Nowhere does CAA Section 114 contain a grant of authority to *third parties* who do not own or operate emission sources, or allow EPA to delegate any of its authority to such third parties. *See* 42 U.S.C. § 7414(a)(1).

Section 114 includes requirements that the reports maintained by owners and operators "shall be available to the public" (42 U.S.C. § 7414(c)) and places requirements and limitations on how EPA may access those records (42 U.S.C. §

7414(a)(2); *id.* at (d)).  These provisions indicate Congress' clear intent that it is EPA, and not third parties, who are authorized to inspect owners and operators.

EPA can only exercise the authority Congress has delegated to it. *Massachusetts v. EPA*, 549 U.S. 497, 534-35 (2007) (noting that EPA must "ground its reasons for action or inaction in the statute" and "exercise its discretion within defined statutory limits.").  It is well established that federal agencies may not delegate their statutory authorities to private parties. *See Perot v. Federal Election Comm'n*, 97 F.3d 553, 559 (D.C. Cir. 1996) ("We agree with the general proposition that when Congress has specifically vested an agency with the authority to administer a statute, it may not shift that responsibility to a private actor . . .").  EPA plainly lacks authority under the CAA to delegate its monitoring duties to private third parties.

The CAA's Section 304 citizen suit provision further solidifies this unassailable statutory truth.  CAA Section 304 contains strict restrictions on the types of actions a citizen can initiate, the notice it must provide to alleged violators, and the process in which to do so, including providing the federal district courts with jurisdiction over such actions.  *See* 42 U.S.C. § 7604.  However, nowhere in CAA Section 304 is a delegation of EPA's monitoring duties to third parties.

The Final Rule's deputization of third parties also upends the cooperative federalism enshrined in the CAA by Congress.  CAA Section 114 has specific

18

provisions for state enforcement, allowing EPA's administrator to "delegate to such State any authority he has to carry out this section." 42 U.S.C. § 7414(b)(1). Absent from CAA Section 114 is any authorization for EPA to delegate its monitoring requirements to third parties. The Super Emitter Program turns this delicate balance on its head, duplicating and conflicting with existing state regulations and policymaking functions and upsetting the core cooperative federalism principle underlying the CAA. Continental already works with the states and EPA to monitor potential emissions events, and the Super Emitter Program only serves to detract from existing emission control efforts and greatly dilute states' authority under the CAA to develop, implement and enforce state programs.

### B. The Super Emitter Program will cause immediate irreparable harm to Continental.

Under the Final Rule, third parties may submit reports of "super emitter" events to EPA within 15 days of observation. 89 Fed. Reg. at 17,050 (§60.5371b(c)(9)). EPA then has an unlimited amount of time to review and verify the third-party notification before sharing it with the operator and publicly posting the alleged "super emitter" event online. *Id.* (§60.5371b(c)). Therefore, significant amounts of time could pass before an operator such as Continental could be notified of the alleged event, delays that could increase both potential emissions and fines in the event of verified excess emission events. These outcomes are not only

19

inconsistent with the intent of the CAA Section 111's monitoring provisions, but they also financially harm operators and raise significant due process concerns.

First, Continental will be obligated to investigate and respond to super emitter notifications under the threat of penalties and injunctive relief regardless of whether the alleged super emitter events are remotely valid or involve Continental's facilities. Second, the super emitter notification will be made public, before operators such as Continental have the opportunity to rebut the notification by showing it was either not from one of their facilities or was an otherwise allowable emission event – causing potential reputational harm through assumed non-compliance by nature of the public notice. *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59, 103 (D.D.C. 2017), *aff'd*, 928 F.3d 1102 (D.C. Cir. 2019) ("Injury to reputation can, at least at times, rise to the level necessary to support the issuance of an injunction.").

Further, Continental will face immediate administrative harms from super-emitter reports. The remote sensing technology allowed by "qualified" super emitter third-party notifiers will undoubtedly detect non-fugitive emissions and allowable emissions events such as lawfully permitted operations (e.g. emission events allowable under the Final Rule). However, Continental will be required to spend unnecessary time and resources to research and document these allowable emissions events, taking resources away from efforts that could otherwise improve Continental's operations.

20

As just one example, Continental recently received a notification from Bloomberg NEF utilizing NASA data alleging a super emitter event, which was in fact an allowable well maintenance activity. Attachment 1 at ¶¶48-49. However, Continental's staff was required to spend significant time investigating the alleged emissions event solely to confirm it was due to a routine (and allowed) well maintenance activity. *Id*. The Super Emitter Program thus will be just as likely to divert resources from the goals of the CAA as to help identify true sources of unknown excess emissions events.

Operators such as Continental also face risks of reputational harm under the Super Emitter Program. Under the Final Rule, third-party super emitter notifications will be made public after EPA determines a notification is "complete and does not contain information that the EPA finds to be inaccurate to a reasonable degree of certainty." 89 Fed. Reg. at 17,050 (§60.5371b(c)). Notably, this is *not* a determination that the notification covers a *bona fide* super emitter event, just that emissions in some form (whether allowable under the Final Rule or not) were observed. Operators such as Continental thus face reputational harm from reported events that in many instances will not constitute any violation under the Final Rule.

Finally, the Super Emitter Program is ripe with opportunities for abuse. The Super Emitter Program imposes unequal certification requirements on third-party notifiers and the operators who must respond to alleged super emitter events. Under

21

the Final Rule, certified third-party monitors submitting false super emitter reports to EPA only face the potential of having their certification revoked.  *See* 88 Fed. Reg. at 17,049 (§ 60.5371b(b)(5)).  Remarkably, when submitting a super emitter report, the third-party notifier must only certify that:

> "Based on my professional knowledge and experience, and inquiry of personnel involved in the collection and analysis of the data, the certification submitted herein is true, accurate, and complete."

*See* 88 Fed. Reg. at 17,050 (§ 60.5371b(c)(8)).  In contrast, when responding to a super emitter notification, operators such as Continental must certify that:

> . . . the certification submitted herein is true, accurate, and complete. *I am aware that knowingly false statements may be punishable by fine or imprisonment*.

*See* 88 Fed. Reg. at 17,051 (§ 60.5371b(d)(3)).  The Final Rule's unequal certification requirements on third-party notifiers and operators is arbitrary and capricious. Third-party notifiers are not faced with consequences of any significance for materially false reports besides losing their qualifications, while those false reports could cause significant harm to operators in the form of lost reputation and lost resources in responding to the super emitter reports.  Attachment 1 at ¶54.

## CONCLUSION

For the reasons explained above, and in Movant States' Motion to Stay, Continental respectfully requests that the Court stay the Final Rule pending the consolidated legal challenges herein.

Dated:  May 6, 2024                    Respectfully submitted,

                                       CONTINENTAL RESOURCES, INC.

                                       *s/ Paul M. Seby*
                                       Paul M. Seby
                                       Greenberg Traurig, LLP
                                       1144 15th Street, Suite 3300
                                       Denver, CO 80202
                                       Telephone:  (303) 572-6584
                                       Fax:  (303) 572-6540
                                       sebyp@gtlaw.com

                                       ***Counsel for Intervenor Petitioner Continental Resources, Inc.***

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 5,194 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the requirements of Fed. R. App. P. 27(d)(1)(E), 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.


Dated:  May 6, 2024                    /s/ *Paul M. Seby*
                                       Paul M. Seby

## CERTIFICATE OF SERVICE

I hereby certify that, on this 6th day of May 2024, a copy of the foregoing brief was served electronically through the Court's CM/ECF system on all ECF-registered counsel.

/s/ *Paul M. Seby*
Paul M. Seby

# ATTACHMENT 1

## Declaration of Sean Flynn

**Submitted in Support of Intervenor Petitioner Continental Resources, Inc.'s Response in Support of Motion to Stay**

**ORAL ARGUMENT NOT YET SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

|  |  |  |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| *Petitioners*, | ) | |
| | ) | |
| v. | ) | No. 24-1054 (consolidated with Nos. 24-1059; 24-1101; 24-1103) |
| | ) | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*, | ) | |
| | ) | |
| *Respondents*. | ) | |
| | ) | |

On Petition for Review of Final Action of the
United States Environmental Protection Agency

**DECLARATION OF SEAN FLYNN
Submitted in Support of Intervenor Petitioner Continental Resources, Inc.'s
Response in Support of Motion to Stay**

I, Sean Flynn, declare that the following statements made by me are true and correct to the best of my knowledge, information, and belief:

1.    I am the Vice President of Health, Safety, and Environmental at Continental Resources, Inc. ("Continental").  I have worked for Continental for 5 years in Oklahoma City, Oklahoma.

2.    As part of my duties, I manage the Health, Safety and Environmental processes and personnel supporting Continental's companywide operations and development activity.

3.    I am familiar with the day-to-day and long-term operations of Continental, and I am qualified and authorized by Continental to speak to the matters discussed in this declaration.

4.    I am submitting this declaration in support of Continental's Response in Support of Motion to Stay the United States Environmental Protection Agency's ("EPA") final rule entitled *Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review*, 89 Fed. Reg. 16,820 (March 8, 2024) ("Final Rule").

5.    Continental is a top ten oil producer in the U.S. based in Oklahoma City, Oklahoma.  Continental is the largest leaseholder and one of the largest producers in the Bakken play of North Dakota and Montana.  Continental also has significant positions in the SCOOP and STACK plays in the Anadarko Basin in

2

Oklahoma and positions in the Powder River Basin in Wyoming and the Permian Basin in Texas.

6.     As of December 31, 2023, Continental was involved in the production of 2,304,317 developed acres and 936,385 undeveloped acres, and owned a working interest in 8,536 wells across all basins in which it operates. Approximately 320,000 acres of that acreage includes federal and Bureau of Indian Affairs lands.

7.     Based on my familiarity with Continental's operations, the new requirements in the Final Rule impose numerous compliance burdens on Continental.

<u>Compliance Burdens and Harms Relating to the Final Rule's "Presumptive Standards"</u>

8.     Continental conducts significant planning of its operations across the multiple states in which it operates. This includes projecting the staffing necessary to comply with state requirements for existing oil and gas production sources across those states.

9.     The Final Rule implements significant regulatory changes across both existing and new oil and gas related sources of emissions.

10.     For existing sources, the Final Rule creates new federal "presumptive standards" for existing sources in EG OOOOc, significantly altering how many of Continental's existing emissions sources will need to be operated.

11.     Continental has already started the burdensome planning process of complying with EPA's new presumptive standards, as the changes in the Final Rule are so significant that waiting for a final adjudication of the validity of the Final Rule will put Continental at risk of non-compliance in the immediate future.

12.     Further, some of the changes for Continental's existing sources have immediate compliance obligations starting on May 7, 2024, the effective date of the Final Rule.

13.     For example, the changes in the Final Rule prohibiting the flaring of associated gas from existing wells constructed after December 6, 2022, (unless a technical feasibility demonstration is made) will substantially disrupt Continental's operations starting on May 7, 2024.

14.     Continental has at least 140 sites which are subject to the Final Rule's May 7, 2024 requirement that the associated gas be (1) routed (recovered) into a sales line; (2) used onsite as a fuel source; (3) used for another useful purpose; or (4) reinjected into the well or another well.

15.     Continental also plans to continue with its current development schedule which will increase the total number of sites subject to the Final Rule's requirements.

4

16.    At these site, Continental does not always have the option to route gas into a sales line (or the ability to use it onsite as a fuel source, for another useful purpose, or reinject it into another well).

17.    For example, sometimes there are existing sales lines near the wells, but those sales lines lack adequate capacity.

18.    Other times, the gas may be of so little quality as to have no beneficial use.

19.    Typically, Continental would control stranded gas (e.g. associated gas without access to a sales line (for economic or infrastructure reasons) or the ability to be applied to other beneficial uses through standard control device options such as flares, enclosed combustion devices, thermal oxidizers, catalytic incinerators, and deep well injection.

20.    Under the Final Rule, Continental's only option to avoid shut-in or curtailment of an existing well with stranded gas will be to demonstrate and certify technical infeasibility of the four options under the Final Rule, which will be both time-consuming and, in many instances, impossible to establish.

21.    For option 1 (routing into a sales line), the Final Rule does not allow any determination of economic feasibility, but only technical feasibility.

22.    This fails to take into account the reality that Continental often deals with operating wells in legacy fields – while there may be gas sales lines nearby,

5

they are at times not of sufficient capacity, design, or mechanical integrity to handle the associated gas from a modern horizontal well since they were originally constructed for the legacy fields' existing vertical production.

23.    Due to the nature of Continental's operations in legacy fields, these OOOOb subject assets do not qualify as wildcat or delineation wells because there are already existing wells nearby.

24.    Further, Continental does not have any control over midstream providers who will ultimately build the associated gas routing infrastructure. Continental cannot force a midstream provider to immediately supply a gas sales line of sufficient capacity starting on May 7, 2024 (the effective date of the rule). This means that Continental would be immediately required to shut-in or curtail existing production unless all elements of the technical feasibility demonstration were made and approved by EPA.

25.    As to option 3 (evaluating a "comprehensive" list of any other "useful purpose" for which the associate gas could serve), the Final Rule provides no guidance for Continental or a qualified professional to depend upon.  89 Fed. Reg. at 16,887.

26.    Even starting at the publication date of the Final Rule on March 8, 2024, there simply was not adequate time for Continental to make these demonstrations for the more than 140 sites subject to this requirement.

27.    The effect of this onerous requirement to route associated gas to a sales line is that Continental must immediately shut-in  or curtail these subject wells with associated gas.

28.    In the Final Rule, EPA ignores these realities and instead focuses its cost-benefit analysis of the prohibition on flaring on GHGRP subpart W data for larger emissions sources which is not representative of real-world conditions.

29.    More specifically, based on my experience with oil and gas operations, the larger emission sources analyzed by EPA are more likely to eventually capture and sell associated gas due to economic considerations.

30.    The emissions events in the GHGRP subpart W data EPA relied upon are likely temporary flaring of the largest gas-producing wells during periods of well startup  or  gathering  system  interruption,  which  is  allowable  under  current regulations and the Final Rule for a period of 30 days.  Thus, the data EPA relies upon to justify its prohibition on flaring does not represent emissions reductions that will actually occur under either current regulations or the Final Rule.

31.    EPA's cost analysis for the prohibition on flaring should instead have focused on smaller sources of associated gas that would effectuate actual emission reductions.

32.    The Final Rule's prohibition on associated gas flaring will cause immediate economic harm to Continental in several ways, including:

7

a. Lost revenue from both the oil and gas produced from the wells as Continental will be required to shut in or curtail those wells until a midstream provider can provide associated gas sale line infrastructure, or capacity becomes available on the existing infrastructure;

b. Loss of leasehold, whereby a lease would expire prior to sufficient sales line infrastructure being available in the area;

c. Damage to artificial lift equipment at the well sites; and

d. Violation of existing financing agreements and contracts requiring production from the subject wells.

33.    Further, the associated loss of production would result in reduced royalties and extraction taxes both to the states in which Continental operates and to the federal government.

<u>Impossibility of Certain Requirements in the Final Rule</u>

34.    Based on my experience and knowledge of Continental's operations, the Final Rule imposes net heating value ("NHV") monitoring requirements and for new sources that are impossible to meet.

35.    Section 60.5417b of the Final Rule requires operators to "[c]ontinuously monitor or collect a sample of the inlet gas to the enclosed combustion device or flare twice daily to determine the average NHV of the gas stream for 14 consecutive operating days." 89 Fed. Reg. at 17,105.

8

36.    Continental estimates that it has at least 150 devices subject to this requirement, which I understand *must* be in place on the Final Rule's effective date of May 7, 2024.

37.    In many instances continuous monitoring or one-hour sampling is technically infeasible given the intermittent flow to control devices. Flow to the control device may occur for as little as a few minutes making continuous monitoring or collection of a single one-hour sample impossible, let alone 28 one-hour samples as required by the Final Rule. Sampling equipment is also not designed to operate in low temperatures or with all types of gases.

38.    Even assuming sampling is technically possible, based on a review of Continental's available personnel, sampling times, and the Final Rules' requirements, I estimate that this required sampling would take *at least* 79 days to conduct at these existing facilities.

39.    Therefore, Continental *never* had sufficient time to complete this testing prior to the Final Rule's effective date.

40.    Further, in public communications with service providers who would process the sampling required under the Final Rule, Continental has universally been informed that there is not sufficient lab capacity to conduct the required sampling in a reasonable timeframe. In many instances, the labs that will test the required sampling are backed up for months, if not longer.

41.    This is exemplified by a recent April 5, 2024, letter to EPA from SPL Inc., the largest laboratory in the United States specializing in the analysis of hydrocarbon products and a leading provider of compliance and testing services for the oil and gas industry.  **Exhibit 1**, hereto.

42.    In the April 5, 2024, letter, SPL Inc. notified EPA Administrator Michael Regan that based on its expertise, it did not believe compliance with the NHV and control device flow testing requirements in the Final Rule was possible within the timeframes required.  *Id.* at 1.

43.    Specifically, SPL Inc. stated:

The amount of additional natural gas samples this requirement will result in is vastly greater than the capacity that laboratories have to collect and process such samples in the 60-day window. For example, a producer with 70 devices subject to net heating value determination would mean that they will produce 1960 samples in a 14-day period (assuming each location has both a high- and low-pressure flare). *This testing increase from one customer alone, when considered with the volumes generated in the 60-day period nationally, would far exceed the analytical capacities of US laboratories performing the analysis. For SPL specifically, 1960 samples in 14 days would exceed the monthly throughput of most of our regional laboratories*. There are not enough gas chromatographs, sample cylinders, and human resources to make compliance within 60-days a possibility.

(emphasis added).

44.    As noted earlier, Continental estimates that it has at least 150 devices subject to these requirements, which alone would exceed SPL Inc.'s laboratory capabilities.

10

<u>The Final Rule's Super Emitter Program Will Harm Continental's Operations</u>

45.    Based on my familiarity and experience with Continental Resource's operations, the Final Rule's Super Emitter Program will cause immediate irreparable harm to Continental and its operations.

46.    *First*, any delays between the time (i) a certified third-party monitor discovers a valid super emitter event and EPA reviews and approves the notification, and (ii) Continental is eventually notified of the super emitter event, will subject Continental to additional fines or penalties for ongoing emissions that could have otherwise been prevented.

47.    *Second,* Continental already spends considerable company resources investigating alleged super emitter notifications that were the result of lawful and permitted operations allowable under current regulations.

48.    For example, within the past year, Continental received a notification from Bloomberg NEF, utilizing NASA data, of an alleged super emitter event. Continental's personnel spent over five (5) hours identifying the source of the emissions only to eventually discover that the emissions were part of an allowable maintenance event – which is allowed under both current regulations and the Final Rule.

49.    Further, this was an *informal* investigation just to determine the source of the emissions and did not include a formal report as will be required under §

11

60.5371b of the Final Rule. I anticipate that formal super emitter reports will take significantly more time to prepare, putting a strain on Continental's resources.

50.    I have significant concerns that well-meaning certified third-party notifiers under the Super Emitter Program will add to this administrative burden by creating notifications for alleged emissions events that are actually lawful well workover activities and not qualified super emitter events.

51.    The practical effect of the Super Emitter Program is that Continental will be required to devote substantial resources to continually responding to and debunking instances of allowable emissions events, thus straining resources and diverting them from actual productive efforts to improve Continental's operations.

52.    *Third*, the Final Rule's requirement that super emitter notifications are immediately made public before Continental can dispute the alleged emission event or prove that it was not at a Continental facility will cause harm to Continental.

53.    Once an alleged super emitter notification is published, it remains in EPA's public super emitter database even if (i) the operator submits a report showing that the latitude and longitude of the alleged event is not within 50 meters of any of the operator's facilities, or (ii) the operator's super emitter report demonstrates that the emissions event was due to allowable well maintenance activities (such as well workover activities).

12

54.    For otherwise lawful well workover events, the public posting of alleged super emitter events only serves to harm Continental's reputation and create an untrue public perception that Continental is not complying with current regulations.

55.    Finally, I believe that the Super Emitter Program is rife with potential for abuse.

56.    It is my understanding that under the Final Rule, certified third-party notifiers submitting false super emitter reports to EPA face only the potential of having their license revoked and not more serious sanctions (i.e., fines and penalties). Conversely, operators like Continental are subject to fines and penalties - and even imprisonment - for submitting false super emitter reports in response to super emitter notifications.  *See* 88 Fed. Reg. at 17,049 – 17,051 (§ 60.5371b(b)-(d)).

57.    The disproportionate burdens placed on operators (potential fines and imprisonment for false super emitter reports) when compared to the penalties to third-party notifiers (simply losing their certification) creates a system by which third-party notifiers are encouraged to be as overinclusive as possible in reporting alleged super emitter events.  Operators, on the other hand,  will be forced to be over-responsive when addressing potentially meritless reports or else risk fines and penalties.

13

<u>Conclusion</u>

58.    Based on the foregoing, if the Final Rule is not stayed, Continental will be subject to immediate irreparable harms.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Signed this 6th day of May 2024, in Oklahoma City, Oklahoma.

_____
Sean Flynn
Vice President, Health, Safety, and Environmental
Continental Resources, Inc.

# EXHIBIT
# 1



24 Waterway Ave, Suite 375
The Woodlands, TX 77380
(720)-683-8633

To:         Michael S. Regan
            EPA Administrator
            1200 Pennsylvania Ave, N.W.
            Washington, DC 20460


Date:       March 19th, 2024


Mr. Regan,

On behalf of SPL, Inc and our many customers in the oil and gas industry, I submit this letter to you regarding the recently published 40 CFR Part 60 "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for existing Sources: Oil and Natural Gas Sector Climate Review". I write to provide specific commentary regarding the 60-day compliance mandate § 60.5370b for control devices § 60.5417b(d).

SPL is the largest laboratory in the United States specializing in the analysis of hydrocarbon products, processing more than 225,000 natural gas samples each year. In recent months, we have received countless inquiries from our customers seeking guidance on how to determine the net heating value of their vent gases. Speaking from our direct experience analyzing 1,000s of vent gas samples from every major oil and gas producing region of the United States annually, it would be exceptionally uncommon for the heating value of vent gas to fall below the threshold the EPA has set. Should the EPA not reconsider this requirement, we at SPL believe compliance with the rule as written is possible, but not within the timeframe required to comply. Below, we submit several concerns that the EPA should consider before enforcing any mandate on the oil and gas companies related to this requirement.

- Vent gases are exceptionally heavy gases (relative to air) that are typically depleted with respect to lighter hydrocarbon molecules such as methane and ethane, and enriched in molecules like propane, butane and pentane. As a result, these heavy gases have a lower vapor pressure (relative to a methane-enriched sales gas for example) and therefore don't "flash" from the liquid hydrocarbon stream until the final stage of separation. Whereas the net heating value of methane is 909.4 Btu/ft$^3$, the net heating value of propane, n-butane and n-pentane is 2,315 Btu/ft$^3$, 3,000 Btu/ft$^3$ and 3,707 Btu/ft$^3$ respectively (source: GPA 2145). Therefore, unless there is a source of inert gas diluting the vent gas stream (sources of inert gas could be added by design, or, due to leaking equipment), there should be no compositional reason the net heating value of that gas would be under the threshold set by the EPA. Speaking directly to SPL's experience, any vent gas sample falling below the EPA's threshold would have been significantly diluted by an inert gas.

- The amount of additional natural gas samples this requirement will result in is vastly greater than the capacity that laboratories have to collect and process such samples in the 60-day window. For example, a producer with 70 devices subject to net heating value determination would mean that they will produce 1960 samples in a 14-day period (assuming each location has both a high- and low-pressure flare). This testing increase from one customer alone, when considered with the volumes generated in the 60-day period nationally, would far exceed the analytical capacities of US laboratories performing the analysis. For SPL specifically, 1960 samples in 14 days would exceed the monthly throughput of most of our regional laboratories. There are not enough gas chromatographs, sample cylinders, and human resources to make compliance within 60-days a possibility.



24 Waterway Ave, Suite 375
The Woodlands, TX 77380
(720)-683-8633

- The EPA is requiring "the minimum time of collection for each individual sample be at least one hour". This requirement goes against the traditional norms for the collection of natural gas samples and therefore will require all sampling entities to deploy alternative strategies that are not widely available at the moment. Proper sample collection techniques are paramount to ensure a representative sample is analyzed by the laboratory. Typical methods for the collection of natural gas samples call for spot sampling techniques that procure gas on very short (seconds to minutes) timescales. The one-hour requirement set forth in the regulation will require the composite sampling techniques typically used in custody-transfer applications (and elsewhere) to be adapted to a more rugged and transportable set up to meet compliance. Again, this requirement can be achieved, but not within the current scope of 60 days. Alternatively, sample collection methods such as those referenced in GPA 2166-22 should be considered permissible by the EPA to eliminate this bottleneck all together.

- The description of the sample canister provided in the regulation suggests the EPA will require Summa Canisters for vent gas collection. Summa canisters present several logistical hurdles that make compliance with § 60.5417b(d) difficult because they are expensive, large, and are not designed for applications such this. Summa cannisters were designed primarily for atmospheric gas sampling. In order to collect 1-hour samples by summa cannister, restrictive flow metering devices will be required. These devices primarily rely on restrictive orifice to meter the gas into the summa cannister. The potentially wet and dirty nature of flare gas will rapidly foul these devices resulting in errors in collection and potential contamination bias. Instead, for operators and laboratories to meet sample demand in a reasonable manner, single cavity stainless steel constant volume cylinders should be allowed for sample collection so long as they are maintained according to the requirements set forth in 43 CFR 3175 (Onshore Oil and Gas Operations; Federal and Indian Oil and Gas Leases; Measurement of Gas).

- The analytical method for the compositional analysis of vent gas samples, ASTM D1945, from which net heating value is then calculated, is not widely available. The industry standard for determination of heating value is GPA 2261, however, we understand that certain components of the natural gas the EPA desires, including helium, oxygen and hydrogen, are not standard components of GPA 2261 analyses. Therefore, laboratories across the US will require additional time for method development of ASTM D1945 to have the capacity readily available to our customers. Part of this method development may require additional equipment and/or modification for existing equipment that cannot be achieved in the 60-day timeframe.

SPL supports the efforts of the administration to curb GHG as it is a common goal shared with the oil and gas industry. However, we urge the EPA to extend the time for compliance past the current 60-day period and to alter the sampling techniques to the more applicable industry standards set forth by GPA Midstream and the American Petroleum Institute.

Sincerely,

Andrew O. Parker, Ph.D.
President – Laboratories
Andrew.Parker@spl-inc.com
(720)-683-8633