**ORAL ARGUMENT NOT YET SCHEDULED**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| STATE OF TEXAS, *et al.*, ) <br> ) <br> *Petitioners*, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES ENVIRONMENTAL ) <br> PROTECTION AGENCY, *et al.*, ) <br> ) <br> *Respondents*. ) <br> ) | No. 24-1054 (and consolidated cases) |

**INTERVENOR PETITIONER CONTINENTAL RESOURCES, INC.'S REPLY IN SUPPORT OF MOTION TO STAY**

Paul M. Seby
Greenberg Traurig, LLP
1144 15th Street, Suite 3300
Denver, CO 80202
(303) 572-6500 - Telephone
(303) 572-6540 - Facsimile
sebyp@gtlaw.com

***Counsel for Intervenor Petitioner Continental Resources, Inc.***

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................i

TABLE OF AUTHORITIES ........................................................................................ ii

GLOSSARY OF TERMS ........................................................................................... iii

INTRODUCTION ........................................................................................................1

ARGUMENT ................................................................................................................1

    I.    Continental Properly Argues Issues Raised by the Various Petitioners in this Action. ...........................................................................2

    II.   Continental's, Movant States', and Texas Petitioners' Arguments Satisfy the Stringent Requirements for a Stay of the Final Rule. ..............4

        A.   Continental has legitimate reliance interests in preserving the proper balance of state and federal authority under the Clean Air Act. ......................................................................................................4

        B.   The new source performance standards in the Final Rule are unlawful. .................................................................................................6

        C.   The Super Emitter Program in the Final Rule is an unlawful delegation of EPA's authority. .......................................................10

CONCLUSION ...........................................................................................................12

# TABLE OF AUTHORITIES

                                                                                                 Page(s)

**Cases**

*Mingo Logan Coal Co. v. Envtl. Prot. Agency*,
   829 F.3d 710 (D.C. Cir. 2016)......................................................................5

*National Ass'n of Regulatory Utility Com'rs v. I.C.C.*,
   41 F.3d 721 (D.C. Cir. 1994).........................................................................2

*Nken v. Holder*,
   556 U.S. 418, 434 (2006)..............................................................................1

*West Virginia v. EPA*,
   597 U.S. 697 (2022)......................................................................................7

**Statutes**

42 U.S.C. § 7411(CAA§ 111).................................................................4, 6, 7, 8, 11

**Other Authorities**

86 Fed. Reg. 63,110 (Nov. 11, 2021) ................................................................6, 8

87 Fed. Reg. 74,702 (Dec. 6, 2022) ........................................................................6

89 Fed. Reg. 16,820 (March 8, 2024)............................ 1, 3, 4, 5, 6, 8, 9, 10, 11, 12

# GLOSSARY OF TERMS

| | |
|---|---|
| BSER | Best System of Emission Reduction |
| CAA | Clean Air Act |
| EPA | Environmental Protection Agency |
| Final Rule | "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review," 89 Fed. Reg. 16,820 (Mar. 8, 2024) |
| VOC | Volatile Organic Compounds |

## INTRODUCTION

Pursuant to the Court's *per curiam* order granting Intervenor Continental Resources, Inc. ("Continental") a reply (Doc. No. 2054188), Continental submits this reply to the U.S. Environmental Protection Agency *et al.'s* ("EPA") (Doc. No. 2055082) and the Environmental and Health Respondent-Intervenors' (Doc. No. 2055113) replies to Continental's Response in Support of Motion for Stay ("Continental Response") (Doc. No. 2053097). Continental renews its support of Petitioners' – 24 States and one state legislature ("Movant States") – motion to stay ("Movant States' Motion") the Environmental Protection Agency's ("EPA's") Final Rule entitled *Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review*, 89 Fed. Reg. 16,820 (March 8, 2024) ("Final Rule"). Doc. No. 2049412. For the reasons stated in Movant States' Motion and herein, Petitioners and Continental have satisfied the stringent requirements for a say of the Final Rule. *See Nken v. Holder*, 556 U.S. 418, 434 (2006).

## ARGUMENT

Continental properly raised issues relating to all Petitioners' underlying challenges to the Final Rule. Continental's arguments in support of Movant States' Motion underscore the need for a stay of the Final Rule. EPA's and Environmental

1

and Health Respondent-Intervenors' replies fail to rebut these critical issues with the Final Rule.

**I.	Continental Properly Argues Issues Raised by the Various Petitioners in this Action.**

Continental is not limited to arguing solely issues raised by Movant States' Motion, but rather is limited to the issues raised by Petitioners in their various petitions. *National Ass'n of Regulatory Utility Com'rs v. I.C.C.*, 41 F.3d 721, 730 (D.C. Cir. 1994) ("Intervenors may only argue issues that have been raised by the principal parties . . . in their request for review.").

Continental's Motion to Intervene was clear in that intervention was sought in order to support Movant States in Case No. 24-1059, the Texas *et al.* Petitioners ("Texas Petitioners") in Case No. 24-1054, and future petitioners in "any other cases that may be later filed seeking review of the Methane Rule." Doc. No. 2048635; *See also* D.C. Cir. Rule 15(b) ("A motion to intervene . . . will be deemed a motion to intervene in all cases before this court . . . including later filed cases.").

The two statements of issues filed by Movant States and the Texas Petitioners raise the same issues argued in the Continental Response. For example, both Movant States and the Texas Petitioners identified that they are challenging the new source categories under Section 111(b) of the Clean Air Act ("CAA"), 42 U.S.C. § 7411(b). Movant States' Nonbinding Statement of Issues, Doc. No. 2049595 at ¶ 1; Texas Petitioners' Nonbinding Statement of Issues, Doc. No. 2048668 at ¶ 1.

2

Movant States and the Texas Petitioners are also challenging the Final Rule's "Super Emitter Program." Doc. No. 2049595 at ¶ 5; Doc. No. 2048668 at ¶ 4.[1] Further, both Movant States and the Texas Petitioners are challenging the Final Rule's "presumptive standards." Doc. No. 2049595 at ¶ 3; Doc. No. 2048668 at ¶ 3. Lastly, Movant States are also challenging the Final Rule's 111(d) requirements. Doc. No. 2049595 at ¶ 4.

Further, for many of those now consolidated cases, Petitioners have yet to file their nonbinding statements of issues which are not due until June 5, 2024 at the earliest. *See* Case Nos. 24-1101, 24-1103, 24-1111, 24-1114, 24-1115, 24-1116, 24-1117, 24-1118. Given that all of these Petitioners are oil and gas industry associations, the issues raised by Continental in support of Movant States' Motion are likely to be contained within these forthcoming statements of issues.

In fact, the recent additional Motion to Stay filed by the Michigan Oil and Gas Association and Miller Energy Company II, LLC (Doc. No. 2055134) raises many identical issues to those raised in the Continental Response. This includes challenges to the monitoring requirements and restrictions concerning associated gas from oil and gas wells (Doc. No. 2055134 at 2); challenging whether EPA's BSER determinations in the Final Rule were adequately demonstrated and cost justified (*id.*

---

[1] EPA also admits that Movant States' Motion raises issues about the Super-Emitter Program. Doc. No. 2055082 at 2.

at 9); whether the EPA's new source performance standards in the Final Rule were appropriate and cost justified (*id.* at 10); whether the EPA improperly relied on global benefits in justifying the Final Rule and failing to prepare a cost-benefit analysis (*id.* at 11-14); and whether EPA arbitrarily imposed one-size-fits-all requirements for new sources in the Final Rule (*id.* at 14-20).

Continental is simply following this Circuit's direction to present arguments "not made" by the Petitioners they are supporting, but raised in their petitions for review. Circuit Rule 28(d) ("The brief must . . . focus on points not made or adequately elaborated upon in the principal brief, although relevant to the issues before this court.").

## II. Continental's, Movant States', and Texas Petitioners' Arguments Satisfy the Stringent Requirements for a Stay of the Final Rule.

### A. Continental has legitimate reliance interests in preserving the proper balance of state and federal authority under the Clean Air Act.

EPA incorrectly suggests that Continental has no reliance on the proper federal-state balance of responsibilities under Section 7411(d) of the CAA. EPA's contention is based on its conclusory assertion that "EPA did not change its longstanding position on the proper federal-state balance of responsibilities." Doc. No. 2055082 at 3. Yet, as established in Movant States' Motion and Continental's Response, that is exactly what EPA has done by imposing "presumptive standards" for existing sources that tie the states' hands and remove all operational flexibility

in underlying state regulations on which operators such as Continental have long relied.

Continental is irreparably harmed by EPA's sudden about-turn decision to subject existing sources to *immediate* requirements that irreparably harm its operations long-planned in reliance on the flexibility and options already encompassed in state regulations. *See Mingo Logan Coal Co. v. Envtl. Prot. Agency,* 829 F.3d 710, 736 (D.C. Cir. 2016) ("[A]n agency change that undermines serious reliance interests disrupts settled expectations, thereby imposing a significant cost on regulated parties and contravening basic notions of due process and fundamental fairness.").

The Final Rule includes immediate requirements for controlling associated gas from both *existing* and *new* facilities. Doc. No. 2053097 at 8 (noting associated gas must be controlled at existing sources constructed or modified after December 6, 2022 under section 60.5377b of the Final Rule.). These requirements went into effect on May 7, 2024.

EPA's reply glosses over its Final Rule requirements for controlling associated gas at *existing* facilities, instead characterizing them as new source standards. Doc. No. 2055082 at 3-8. However, under the CAA, the statutory term "new source" means any stationary source, the construction or modification of which is commenced after the publication of regulations (*or, if earlier, proposed*

5

*regulations*) prescribing a standard of performance under this section which will be applicable to such source. 42 U.S.C. § 7411(2) (emphasis added); compare *Id.* at 7411(6) ("The term "existing source" means any stationary source other than a new source.").

Notably, EPA's earlier December 6, 2022 proposed regulation, 87 Fed. Reg. 74,702, did not contain any proposed regulatory language, meaning that EPA's decision to subject sources constructed after December 6, 2022 to immediate requirements is regulating *existing sources* without any phase in period, further justifying the compelling need for a stay of the Final Rule.[2] As set forth in the Continental Response, this aspect of the Final Rule imposes significant irreparable harms on Continental *today*. Doc. No. 2053097 at 14-16.

**B. The new source performance standards in the Final Rule are unlawful.**

EPA and Environmental and Health Respondent-Intervenors arguments ignore the plain statutory limitations on EPA's authority for regulating new sources under CAA Section 111(b).

**First**, EPA is wrong to claim that routing associated gas to a sales line is a "system of emission reduction" under Section 111. EPA's Section 111 authority is limited to "the application of measures that would reduce pollution by causing the

---

[2] Similarly, EPA's 2021 proposal also entirely lacked regulatory language. 86 Fed. Reg. 63,110 (Nov. 11, 2021)

6

regulated source to operate more cleanly." *West Virginia v. EPA*, 597 U.S. 697, 725 (2022)). However, when EPA imposes a rule "by design" where there are "no particular controls a [ ] operator can install and operate to attain the emissions limits established," EPA oversteps its authority. *West Virginia*, 597 U.S. at 725. Here, the Final Rule's requirement to forgo controls and instead require operators like Continental to route associated gas to a sales line is exactly such an overstep.

Similarly, Environmental and Health Respondent-Intervenors look past the definition of a "technological system of continuous emission reduction" in Section 111 of the CAA, which requires that it be a "a technological process for *production or operation* by any source which is inherently low-polluting or nonpolluting." 42 U.S.C. § 7411(a)(7)(A) (emphasis added); *see also* Doc. No. 2055113 at 10. Forced routing of associated gas to a sales line is not a technological process for *production or operation* of a source. Instead, it is a prohibition for operators employing any technological processes for production or operation that will reduce emissions, instead requiring that potential emissions are routed elsewhere.

**Second,** EPA's claim that it was not required to "parse the individual costs of" alternative emission control technologies such as enclosed combustion devices, thermal oxidizers, catalytic incinerators, and deep well injection ignores the plain requirements of the CAA. Doc No. 2055082 at 5. Section 111(a)(1) of the CAA requires that EPA establish a BSER by "taking into account the cost of achieving

7

such reduction and any nonair quality health and environmental impact and energy requirements." Instead of "taking into the account" the costs of achieving such reductions, the Final Rule simply *assumes* that there were no cost impacts. *See* 86 Fed. Reg. at 63,237 ("EPA assumes that in situations where gas sales line infrastructure is available, there is minimal cost to owners and operators to route the associated gas to the sales line. While situations at well sites can differ, which would impact this cost, the EPA believes that in every situation the value of the natural gas captured and sold would outweigh these minimal costs of routing the gas to the sales line.") These conclusory *assumptions* do not meet EPA's statutory obligation under Section 111(a)(1) to consider actual costs of achieving proposed emissions reductions.[3]

**Third**, EPA and Environmental and Health Respondent-Intervenors contention that the technical infeasibility demonstrations for determining whether associated gas can be put to another "useful purpose" are straightforward are contradicted by the language of the Final Rule. In the Final Rule, EPA states that the determination operators must make on whether associated gas can be used for

---

[3] For similar reasons, EPA's conclusory dismissal of Continental's argument that EPA should have allowed operators to show that the associated gas requirements were economically infeasible misses the mark. EPA's determination that "that the costs of sales-line routing are generally reasonable and often minimal" (Doc. No. 2055082 at 7 (citing 89 Fed. Reg. at 16,941-42)) is based on a flawed baseline assumption that routing to a sales line is cost-justified, something disallowed by Section 111(a)(1) of the CAA.

8

another useful purpose "is more open ended" and that the Final Rule "does not specify the 'other useful purpose' solutions that must be evaluated." 89 Fed. Reg. at 16,887. EPA states that it is "the responsibility of the owner and operator, along with the qualified professional engineer . . . to ensure that the list of options evaluated is comprehensive to address technically viable solutions." *Id.* This exceedingly vague language is arbitrary and capricious and imposes irreparable harms on Continental, disrupting its existing and planned operations. Doc. No. 2053097 at 12-13.

Further, EPA's statement in the Final Rule that a "technically viable 'other useful purpose' is likely to require the routing of the associated gas to on-site or nearby" sales lines and that a "determination of technical infeasibility requires a showing of site-specific conditions that make these operations infeasible for *even the most basic of such uses*" demonstrates that EPA's technical feasibility requirements are really aimed at a predetermined outcome – routing of gas to a sales line in virtually all instances. *Id.* at 16,887-16,888. This is simply not reasoned agency decision-making.

**Fourth**, Environmental and Health Respondent-Intervenors suggestion that Continental's "operator peers" have emphasized they do not bring on new wells unless they have access to a sales line plainly ignores comments from some of the largest operator associations in the United States, who made clear that there are often

9

situations where operators "do not have adequate or accessible gas gathering infrastructure."  Comments of the American Petroleum Institute, EPA-HQ-OAR-2021-0317-1460 (Feb. 13, 2023) at 29.

**Fifth,** EPA's assertion that Continental can comply with net heating value ("NHV") related monitoring requirements because it has offered a brief 180-day reprieve from those requirements only serves to highlight the immediate irreparable harms imposed by the Final Rule.  EPA's voluntary clarification that operators will be allowed 180 additional days to meet the NVH requirements acknowledges that the requirements were impossible to meet in the first place.  EPA's assumption that the brief respite from the requirement will address Continental's concerns is based on a misreading of Continental's supporting declaration.  In that declaration, Continental clarified that the sampling alone would take "*at least* 79 days."  Doc. No. 2053097 at 16; *Id.* at 41 (¶ 38).  Further, EPA's assertion ignores the fact that Continental and other operators have "universally been informed that there is not sufficient lab capacity to conduct the required sampling in a reasonable timeframe." *Id.* at 41 (¶ 40).

### C. The Super Emitter Program in the Final Rule is an unlawful delegation of EPA's authority.

EPA's claim that it "plays a central role at every step" of the Super Emitter Program ignores the fact that EPA lacks any legal authority to delegate its

monitoring authority to third parties in the first instance, regardless of what "supervisory role" EPA claims to maintain over such a delegation.

EPA's strained contentions also ignore the strict limitations Congress imposed on EPA's ability to delegate authority, noting that EPA's administrator may only "delegate to such *State* any authority he has to carry out this section." 42 U.S.C. § 7414(b)(1) (emphasis added). By delegating monitoring duties to third parties, EPA is irreparably upending the cooperative federalism enshrined in the CAA.

Finally, Continental's reputational harms are not speculative. While EPA may not initially post the Super Emitter Notifications "without owner/operator attribution" (Doc. No. 2055082 at 11), the information in EPA's planned postings still allow the public to identify operators. For example, EPA will post the location of the alleged super emitter event "in latitude and longitude coordinates in decimal degrees to an accuracy and precision of four." 89 Fed. Reg. at 17,050. Further, EPA's contention that Continental will only need to devote "five hours to investigate a potential super emitter event" again misreads Continental's supporting declaration. Doc. No. 2055082 at 11. Instead, Continental asserted that a prior *informal* investigation (which required no formal Super Emitter Event Report as will be required under § 60.5371b of the Final Rule), took over five hours. Doc. No. 2053097 at 42 (¶ 48 of S. Flynn Decl.). Importantly, Continental estimates that the formal reports required by the Final Rule "will take significantly more time to

11

prepare, putting a strain on Continental's resources" and irreparably harming Continental, which is far from the "minimal burden" EPA claims the Super Emitter Program places on operators such as Continental.

## CONCLUSION

For the reasons stated herein, a stay of the Final Rule is justified and should be granted.

Dated: May 22, 2024

Respectfully submitted,

CONTINENTAL RESOURCES, INC.

<u>*s/ Paul M. Seby*</u>
Paul M. Seby
Greenberg Traurig, LLP
1144 15th Street, Suite 3300
Denver, CO 80202
Telephone: (303) 572-6584
Fax: (303) 572-6540
sebyp@gtlaw.com

***Counsel for Intervenor Petitioner Continental Resources, Inc.***

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because it contains 2,583 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the requirements of Fed. R. App. P. 27(d)(1)(E), 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.


Dated: May 22, 2024 /s/ *Paul M. Seby*
Paul M. Seby

## CERTIFICATE OF SERVICE

I hereby certify that, on this 22nd day of May 2024, a copy of the foregoing brief was served electronically through the Court's CM/ECF system on all ECF-registered counsel.

/s/ *Paul M. Seby*
Paul M. Seby
