**ORAL ARGUMENT NOT YET SCHEDULED**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————

Nos. 24-1054, - 1059, -1101, -1103, -1111, -1114, -1115, -1116, -1117

———————

STATE OF TEXAS, *et al.*,
*Petitioners,*
v.
ENVIRONMENTAL PROTECTION AGENCY *and* MICHAEL S. REGAN,
*Administrator, United States Environmental Protection Agency,*
*Respondents.*

———————

On Petition For Review Of Final Agency Action By The United States
Environmental Protection Agency 89 Fed. Reg. 16,820 (Mar. 8, 2024)

———————

## OPENING BRIEF OF INTERVENOR PETITIONER
## CONTINENTAL RESOURCES, LLC.

———————

CONTINENTAL RESOURCES, INC.

Paul M. Seby
Greenberg Traurig, LLP
1144 15th Street, Suite 3300
Denver, CO 80202
(303) 572-6500 - Telephone
(303) 572-6540 - Facsimile
sebyp@gtlaw.com

***Counsel for Intervenor Petitioner***
***Continental Resources, Inc.***

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Intervenor Petitioner Continental Resources, Inc. certifies as follows:

### A. Parties and Amici

Except for the following, all parties, intervenors, and amici appearing before the district court and in this court are listed in the Briefs for State Petitioners and Industry Petitioners:

#### 1. Amici

Amicus in support of Petitioners are the Chamber of Commerce of the United States of America. Amicus in support of Industry Petitioners is the Michigan Chamber of Commerce and Members of Congress.

### B. Rulings Under Review

References to the rulings at issue appear in the Briefs for State Petitioners and Industry Petitioners.

### C. Related Cases

These consolidated cases have not been before this Court or any other court. Intervenor Petitioners are aware of numerous cases challenging distinct, but prior versions of the New Source Performance Standards for the Crude Oil and Natural Gas source category. The designated lead case for those cases is *American Petroleum Institute, et al. v. EPA* (No. 13-1108). The cases consolidated with that

i

case are *American Petroleum Institute v. EPA* (No. 13-1289), *GPA Midstream Association v. EPA* (No. 13-1290), *Texas Oil and Gas Association v. EPA* (No. 13-1292), *Independent Petroleum Association of America, et al. v. EPA* (No. 13-1293), *Western Energy Alliance v. EPA* (No. 13-1294), *Independent Petroleum Association of America, et al. v. EPA* (No. 15-1040), *GPA Midstream Association v. EPA* (No. 15-1041), *Texas Oil and Gas Association v. EPA* (No. 15-1042), *Western Energy Alliance v. EPA* (No. 15-1043), *American Petroleum Institute v. EPA* (No. 15-1044), *State of North Dakota v. EPA* (No. 16-1242), *State of Texas, et al. v. EPA* (No. 16-1257), *Independent Petroleum Association of America, et al. v. EPA* (No. 16-1262), *Interstate Natural Gas Association of America v. EPA* (No. 16-1263), *State of West Virginia, et al. v. EPA* (No. 16-1264), *Western Energy Alliance v. EPA* (No. 16-1266), *GPA Midstream Association v. EPA* (No. 16-1267), *Texas Oil and Gas Association v. EPA* (No. 16-1269), and *American Petroleum Institute v. EPA* (No. 16-1270). There is also a case, *Natural Resources Defense Council v. EPA* (No. 16-1425), that was severed from the above cases, and another set of cases, *Environmental Defense Fund, et al. v. Regan* (No. 20-1360 and consolidated case Nos. 20-1364, 20-1367), involving technical amendments to a previous iteration of the action being challenged here.

Pursuant to the Court's September 4, 2024 Order, ECF Doc. 2073084, *Air Alliance Houston, et al. v. EPA* (No. 24-1118), which also challenges the instant

Rule, has been severed from this consolidated action and held in abeyance. Pursuant to the same Order, two aspects of the Rule for which administrative reconsideration has been sought have been severed from this consolidated action, assigned a separate docket number, and held in abeyance. *American Petroleum Institute, et al. v. EPA* (No. 24-1289).

Dated:  December 16, 2024          CONTINENTAL RESOURCES, INC.


                                   *s/ Paul M. Seby*
                                   Paul M. Seby
                                   Greenberg Traurig, LLP
                                   1144 15th Street, Suite 3300
                                   Denver, CO 80202
                                   Telephone:  (303) 572-6584
                                   Fax:  (303) 572-6540
                                   sebyp@gtlaw.com


                                   **Counsel for Intervenor Petitioner**
                                   **Continental Resources, Inc.**

## <u>CIRCUIT RULE 26.1 DISCLOSURE STATEMENT</u>

Pursuant to Circuit Rules 26.1(a), 27(a)(4) and 28(a)(1)(A) and Fed. R. App. P. 26.1, Continental Resources hereby identifies all parent companies and any publicly held company that has a 10% or greater ownership interest (such as stock or partnership shares) in Continental Resources:

None.

Pursuant to Circuit Rule 26.1(b), Continental Resources hereby identifies Continental Resources' general nature and purpose, insofar as relevant to the litigation: Continental Resources is an Oklahoma corporation with its principal place of business in Oklahoma City, Oklahoma. Continental Resources is an independent oil producer in the U.S., and is a lessee of federal oil and natural gas leases in North Dakota, Montana, and Wyoming.

Dated: December 16, 2024             Respectfully submitted,

                                    *s/ Paul M. Seby*
                                    Paul M. Seby

                                    **Counsel for Intervenor Petitioner**
                                    **Continental Resources, Inc.**

## **TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ........................................... iv

TABLE OF AUTHORITIES ................................................................. vii

GLOSSARY OF TERMS ......................................................................... iix

INTRODUCTION .................................................................................... 1

STATEMENT OF JURISDICTION......................................................... 1

STATEMENT OF THE ISSUES.............................................................. 1

STATUTES AND REGULATIONS......................................................... 2

STATEMENT OF THE CASE.................................................................. 3

      A.    Associated Gas Requirements............................................. 3

SUMMARY OF THE ARGUMENt.......................................................... 4

STANDING ............................................................................................. 7

STANDARD OF REVIEW ..................................................................... 8

ARGUMENT ......................................................................................... 8

I.    The "Presumptive Standards of Performance" in the Final Rule Violate
    Section 111(d) of the Clean Air Act.................................................. 8

      A.    The Final Rule's "presumptive standards of performance" upend
           the cooperative-federalism long enshrined in the Clean Air Act
           by establishing national standards devoid of State application. .......... 9

      B.    The Final Rule's "presumptive standards of performance" harms
           significant reliance interests for operators such as Continental
           Resources........................................................................... 12

II.    The Final Rule's BSER For Associated Gas is Not Adequately
    Demonstrated. ................................................................................ 16

    A.     EPA did not adequately demonstrate that routing associated gas to a sales line is cost-justified or achievable. ..................................... 18

    B.     The technical feasibility demonstrations for associated gas under the Final Rule are arbitrary and capricious. ....................................... 24

III.   The Final Rule's Legally and Practicably Enforceable Emissions Limits for Storage Vessels are Arbitrary and Capricious. ....................................... 26

IV.   The Final Rule's Super Emitter Program is Unlawful and Implicates Serious Due Process Concerns for Regulated Parties. ................................. 27

CONCLUSION ..................................................................................... 30

CERTIFICATE OF COMPLIANCE ....................................................... 32

CERTIFICATE OF SERVICE ............................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*DHS v. Regents of the Univ. of Cal.,*
   591 U.S. 1 (2020)........................................................................14

*Encino Motorcars, LLC v. Navarro,*
   579 U.S. 211 (2016)....................................................................14

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009)....................................................................14

*Freeman United Coal Mining Co. v. Federal Mine Safety & Health
   Review Commission,*
   108 F.3d 358 (D.C. Cir. 1997).....................................................25

*Lignite Energy Council v. EPA,*
   198 F.3d 930 (D.C. Cir. 1999).....................................................16

*Loper Bright Enterprises v. Raimondo, Secretary of Commerce,*
   144 S. Ct. 2244 (2024)................................................................12

*Michigan v. EPA,*
   213 F.3d 663 (D.C. Cir. 2000)...............................................11, 12

*Sierra Club v. Costle,*
   657 F.2d 298 (D.C. Cir. 1981).....................................................16

*Sierra Club v. EPA,*
   292 F.3d 895 (D.C. Cir. 2002).......................................................7

*West Virginia v. EPA,*
   597 U.S. 697 (2022)....................................................................12

**Statutes**

Clean Air Act, 42 U.S.C. §§ 7401, *et seq.*

   CAA § 111(d), 42 U.S.C. § 7411(d)............................ 2, 4, 5, 8, 9, 10, 15, 16

   CAA § 111(d)(1), 42 U.S.C. § 7411(d)(1) ......................................5, 9, 10, 15

CAA § 111(d)(2)(A), 42 U.S.C. § 7411(d)(2)(A) ...........................................9

CAA § 111(d)(2), 42 U.S.C. § 7411(d)(2) ...........................................10, 11

CAA § 111(a)(1), 42 U.S.C. § 7411(a)(1).............................................16, 19

**Regulations**

40 CFR Part 60, Subpart Ba

40 CFR 60.24a(e)(2)...........................................................................16

40 CFR Part 60, Subpart OOOOb

40 CFR 60.5377b..............................................................................17

40 CFR 60.5371b(c)(9).....................................................................28

40 CFR 60.5371b(c) .........................................................................28

40 CFR 60.5371b(d)(3) ....................................................................29

40 CFR 60.5371b..............................................................................29

**Federal Register**

78 Fed. Reg. 22,126 (Apr. 12, 2013) .......................................................26

86 Fed. Reg. 63,110 (Nov. 15, 2021) .............................................15, 19, 21

87 Fed. Reg. 74,702 (Dec. 6, 2022)........................................................23

89 Fed. Reg. 16,820 (March 8, 2024)................. 1, 3, 4, 5, 8, 10, 11, 16, 17, 19, 20,
.............................................................. 21, 22, 23, 24, 25, 26, 27, 28, 29

# <u>GLOSSARY OF TERMS</u>

| | |
|---|---|
| API Comments | American Petroleum Institute Comments, EPA-HQ-OAR-2021-0317-2428 (Feb. 13, 2023), JA__. |
| BSER | Best System of Emission Reduction |
| EPA | Environmental Protection Agency |
| Final Rule | "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review," 89 Fed. Reg. 16,820 (Mar. 8, 2024) |
| MOGA Comments | Michigan Oil and Gas Association Supplemental Proposal Comments, EPA-HQ-OAR-2021-0317-2257 (Feb. 13, 2023), JA__. |
| Oklahoma Alliance Comments | The Petroleum Alliance of Oklahoma Supplemental Proposal Comments, EPA-HQ-OAR-2021-0317-2403 (Feb. 13, 2023), JA__. |
| Producer Association Comments | Independent Petroleum Association of America *et al.* Comments, Doc. EPA-HQ-OAR-2021-0317-0814 (Jan. 31, 2022), JA__. |

## INTRODUCTION

Intervenor Petitioner Continental Resources, Inc. ("Continental Resources") submits this Opening Brief in support of State Petitioners' and Industry Petitioners' challenge to the Environmental Protection Agency's ("EPA's") final rule entitled *Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review*, 89 Fed. Reg. 16,820 (March 8, 2024) ("Final Rule"). To avoid duplicative argument, Continental Resources adopts and incorporates the arguments as set forth in the State Petitioners' and Industry Petitioners' opening briefs.

## STATEMENT OF JURISDICTION

Continental Resources adopts the jurisdictional statements of State Petitioners and Industry Petitioners.

## STATEMENT OF THE ISSUES

Continental Resources adopts the statements of issues of State Petitioners and Industry Petitioners, and writes separately here to address and supplement the following issues:

1.     Whether the Final Rule is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, or is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, by establishing binding and *de facto* standards that States are effectively forced to adopt in

implementing their own plans to govern existing emission sources in violation of Section 111(d) of the Clean Air Act, 42 U.S.C. § 7411(d);

2.      Whether the Final Rule is arbitrary and capricious, an abuse of discretion, otherwise not in accordance with law, or is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, because EPA failed to adequately demonstrate that the Best System of Emissions Reduction ("BSER") for associated gas in the Final Rule is cost-effective or achievable under the Clean Air Act;

3.      Whether the Final Rule is arbitrary and capricious, an abuse of discretion, otherwise not in accordance with law, or is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, because EPA failed to adequately demonstrate and justify the legally and practicably enforceable limits for storage vessels; and

4.      Whether the Final Rule is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, by establishing the "Super Emitter Program," which has no legal basis in the Clean Air Act.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reprinted in the Industry Petitioners' addendum.

2

# STATEMENT OF THE CASE

Continental Resources adopts the Statements of the Case of State Petitioners and Industry Petitioners, with the following limited additional discussion:

## A.     Associated Gas Requirements.

The Final Rule imposes unreasonable restrictions on emissions from "associated gas" (the Final Rule defines "associated gas" as "the natural gas from wells operated primarily for oil production.").  89 Fed. Reg. at 17,129, JA__.

The Final Rule's requirement to route associated gas to a sales line apply not just to "marginal" wells,[1] but also to: (1) *all* wells constructed after May 7, 2026; (2) all wells newly constructed between May 7, 2024 and May 7, 2026; (3) wells newly constructed, reconstructed, or modified between December 6, 2022 and May 7, 2024; and (4) any wells with associated gas over 40 tons-per-year of methane.  Fed. Reg. at 16,832–33, 16,835, JA___–___, JA___.    These four classes of wells encompass both marginal, and non-marginal wells, meaning that the requirement to rout associated gas to a sales line is applicable both marginal, and non-marginal wells.

For these four classes of wells subject to requirements to route associated gas to a sales line, the Final Rule offers only three alternative options: (1) use the gas

---

[1] As discussed by Industry Petitioners, marginal wells are wells generally producing 15 or fewer barrel equivalents per day.  Industry Br. at 11.

onsite as a fuel source; (2) use the gas for another useful purpose; or (3) reinject the recovered gas into the well or another well. 89 Fed. Reg at 16,832–35, JA__-__. Operators of wells constructed or modified between December 6, 2022 and May 6, 2024 can only avoid these requirements by making a technical infeasibility demonstration that routing associated gas is technically impossible (which cannot take cost into account). 89 Fed. Reg. at 16,951, JA__.

To this end, the comments Industry Petitioners highlight regarding the challenges remote wells face in meeting associated gas requirements apply not only to marginal wells, but all wells. Industry Br. at 12. That is because remote wells may be either marginal, or non-marginal, and still subject to the associated gas routing requirements if they are in one of the four defined classes above based on the construction, reconstruction, or modification date of the well.

## SUMMARY OF THE ARGUMENT

**1.** The Final Rule's "presumptive standards" for existing sources violate the cooperative federalism enshrined in Section 111(d) of the Clean Air Act by imposing *de facto* national implementation plans on States that bypass the specific statutory role allocated to the States by Congress. First, in setting national "presumptive standards", EPA has impermissibly intruded on the States' right to fashion their own plans governing existing sources, instead assuming before any State plan has been submitted to EPA that EPA's national regulations must control. Second, EPA's

4

usurpation of States' statutory authority under Section 111(d) excludes the expertise and flexibility that States have developed in regulating existing sources, and which operators have substantially relied upon in developing their operations. By essentially removing consideration of statutory factors such as the "remaining useful life of the existing source" (42 U.S.C. § 7411(d)(1)), EPA has eliminated bedrock principles that operators have relied on in planning future operations in favor of EPA's "we know best" regime.

**2.** The Final Rule's BSER determination for handling of associated gas is not adequately demonstrated in three key ways. First, EPA failed to demonstrate that routing associated gas to a sales line is cost justified – instead assuming that because operators may do so in many instances, it must therefore be cost justified in all instances. By failing to analyze situations where routing associated gas to a sales line would not voluntarily occur, EPA failed to justify its BSER determination.

Second, EPA failed to demonstrate that routing associated gas to a sales line is achievable. EPA acknowledged that it only analyzed situations in which sufficient sales line infrastructure was readily available, wholly failing to consider situations in which gas sales line infrastructure was more than 5 miles away from a sales line, or lacked sufficient capacity. 89 Fed. Reg. at 16,947, JA__. EPA cannot justify the associated gas BSER based on a best-case scenario that simply assumes that the

necessary infrastructure is present – but instead was required to demonstrate the BSER works in common and prevalent conditions, not just the ideal ones.

Third, EPA's "technical infeasibility" option, which allow temporary relief from the associated gas BSER requirements is arbitrary and capricious. The "technical infeasibility" analyses required by the Final Rule provide no discernible standards operators can rely upon, requiring evaluation of a boundless set of possibilities in order to certify that routing associated gas to a sales line is not feasible. Operators to both civil and criminal penalties in the event EPA later determines a technical infeasibility demonstration was completed incorrectly, and arbitrarily and capriciously deprive operators of discernible standards to guide their conduct.

**3.** The Final Rule's legally and practicably enforceable limits for storage vessels are not cost justified, rendering them arbitrary and capricious in two key ways. First, EPA failed to properly analyze the universe of affected storage vessels subject to these provisions of the Final Rule, drastically underestimating the regulatory burden of these provisions. Second, EPA relies upon the fundamentally flawed "social cost" of carbon metric to justify the legally and practicably enforceable limits provisions, rendering the cost-benefit analysis invalid.

**4.** The Final Rule's "Super Emitter Program" exceeds EPA's authority under the Clean Air Act by delegating non-delegable agency functions to deputized private

6

parties. This unlawful delegation also creates significant due process concerns for the regulated community, as otherwise lawful and allowable emission events trigger response and reporting requirements under threat of penalty that detract from regulator operations that would otherwise be focused on reducing emissions, threatening the regulated community with fines or imprisonment in responding to super-emitter reports created by deputized, non-agency, third-parties.

## STANDING

As detailed in Continental Resources motion to intervene, granted by the Court on April 19, 2024, Continental Resources has standing because it is a top ten oil producer in the U.S., is regulated by the Final Rule, and is facing ongoing significant challenges in adapting its operations to meet the requirements of the Final Rule.[2] Continental Resources is therefore directly regulated by the Final Rule, making its standing "self-evident." *Sierra Club v. EPA*, 292 F.3d 895, 899–900 (D.C. Cir. 2002).

Continental Resources also has significant reliance interests adversely affected by the Final Rule, including the "presumptive standards" that will override longstanding State regulations for existing sources on which operators such as

---

[2] Flynn Decl. ¶¶ 7-10, Continental Resources, Inc. Motion to Intervene, ECF Doc. 2048635 (D.C. Cir., Apr. 8, 2024), JA__; Flynn Decl. ¶¶ 8-33, 45-57, Continental Resources, Inc. Response in Support of Motion to Stay, ECF Doc. 2053097 (D.C. Cir., May 6, 2024).

Continental Resources have long relied upon in planning and managing existing oil and gas operations.[3]

## STANDARD OF REVIEW

Continental Resources adopts the Standards of Review in the State Petitioners' and Industry Petitioners' opening briefs.

## ARGUMENT

### I.    The "Presumptive Standards of Performance" in the Final Rule Violate Section 111(d) of the Clean Air Act.

Petitioner States' criticisms of EPA's "presumptive standards" (89 Fed. Reg. at 16,828) highlight EPA's jurisdictional overreach that violates of Section 111(d) of the Clean Air Act.

Two issues merit additional discussion.  First, the Final Rule not only unlawfully limits States' "statutory authority to impose a less stringent standard of performance on an existing source" (States Br. at 26), but goes much farther by establishing and imposing *national* presumptive standards for which EPA wholly lacks authority.  Second, these national presumptive standards remove decades of reliance that operators have placed in planning, developing, and maintaining their existing operations to work within State regulatory regimes upended by the Final Rule.

---

[3] Flynn Decl. ¶¶ 8-33, Continental Resources, Inc. Response in Support of Motion to Stay, ECF Doc. 2053097 (D.C. Cir., May 6, 2024).

**A.    The Final Rule's "presumptive standards of performance" upend the cooperative-federalism long enshrined in the Clean Air Act by establishing national standards devoid of State application.**

Section 111(d) implements the Clean Air Act's cooperative federalism framework for existing sources by requiring EPA to "establish a procedure" for States to submit State plans (typically referred to as State implementation plans, or "SIPs") that "establish[] standards of performance for [certain] existing source for any air pollutant[s]." 42 U.S.C. § 7411(d)(1).  EPA then reviews and approves SIPs if the SIPs' performance standards are "satisfactory" (42 U.S.C. § 7411(d)(2)(A)), based on the BSER guidelines (not mandates) established by EPA.

Following the requirements that standards of performance be "achievable" and "adequately demonstrated," Section 111(d) requires that "[r]egulations of the Administrator under this paragraph shall permit the State in applying a standard of performance *to any particular source* under a plan submitted under this paragraph *to take into consideration*, among other factors, the remaining useful life of the existing source to which such standard applies." 42 U.S.C. § 7411(d)(1) (emphasis added).  Thus, States have the primary authority to create their own SIPs for reducing emission at *existing* sources in their States, subject to EPA review and approval. Congress specifically gave States the authority to consider source-specific factors in their States when creating those SIPs and applying the BSER.  *Id.*

9

Under Section 111(d), EPA may not impose blanket national emission reduction requirements on States or existing sources. EPA is only authorized to review and approve SIPs; EPA cannot transform this limited authority to erase the States' central role in setting performance standards in their SIPs.

These express statutory limitations on EPA's authority are reinforced by Section 111(d)(2), which establishes that EPA may only step into the shoes of a State and impose a Federal Implementation Plan ("FIP") directly regulating existing sources in a State if that State fails to submit a satisfactory SIP. 42 U.S.C. § 7411(d)(2). Thus, EPA does not have the authority under Section 111(d) to establish and impose a "national FIP" as it has done in the Final Rule: instead EPA may only create FIPs on a case-by-case basis for individual States that have failed to meet their obligations in the cooperative federalism framework of the Clean Air Act.[4]

Instead of honoring States' authority to set standards of performance for existing sources, the Final Rule transforms BSER "guidelines" into *presumptive standards* imposed on a national basis, even micro-managing to the level listing specific technologies and methods that must be employed to comply with the

---

[4] EPA acknowledges in the Final Rule that its authority to impose FIPs under Clean Air Act Section 111(d)(2) is distinct form its authority to establish BSER guidelines under Section 111(d)(1), but then disingenuously claims that the "presumptive standards [in the Final Rule] are not the same as a" FIP while admitting that the presumptive standards would "serve as a guide to the development of a" FIP. 89 Fed. Reg. at 16,829, n.21, JA___−___.

national presumptive standards.  89 Fed. Reg. at 16,833-35, JA___ – ___.   States must either include those presumptive standards or prove they meet stringent "equivalency criteria" if States wish to "deviate" from EPA's presumptive standards. 89 Fed. Reg. at 17,142, JA ___.

EPA has authority to impose source-specific emission limitations for existing sources only in States that fail to develop and implement satisfactory SIPs through the case-by-case FIP process. 42 U.S.C. § 7411(d)(2).  Completely by-passing both the SIP and FIP processes mandated by Congress, EPA has already decided in the Final Rule, before a single SIP has been submitted, that any SIP that does not implement its national "presumptive standards" is presumptively unsatisfactory, and that EPA's source specific standards will be imposed nationally one way or another, either through "federalized SIPs" or FIPs.

EPA's imposition of national presumptive standards violates the cooperative federalism requirements of the Clean Air Act.  By leaving the States with no "real choice with regard to the control measure options available to them," EPA has impermissibly intruded on the States' right to fashion their own SIPs, which expertise and flexibility operators have long -relied upon in developing operations. *Michigan v. EPA*, 213 F.3d 663, 687 (D.C. Cir. 2000).  This power grab using an "ancillary" provision of the Clean Air Act used "only a handful of times since the enactment of the statute in 1970" (*West Virginia*, 597 U.S. at 710) should be treated

11

with "skepticism" without "clear congressional authorization" to the contrary (*id.* at 732). That skepticism is particularly heightened where, as here, EPA has removed all authority from the States to exercise their Congressionally granted discretion to "submit plans containing the emissions restrictions that they intend to adopt and enforce." *Id.* at 710. Reading out the statutory role Congress provided States in Section 111, and instead claiming a newfound authority to impose national one-size-fits all presumptive standards for the first time, is not the "best" interpretation of Section 111. *Loper Bright Enterprises v. Raimondo, Secretary of Commerce,* 144 S. Ct. 2244, 2266 (2024) ("In the business of statutory interpretation, if it is not the best, it is not permissible.").

### B. The Final Rule's "presumptive standards of performance" harms significant reliance interests for operators such as Continental Resources.

The Final Rule's usurpation of State statutory authority and unlawful imposition of one-size-fits all national requirements harms operators such as Continental Resources, who have planned and developed their operations for existing sources in reliance on the flexibility and options encompassed in State regulations established under the Clean Air Act's cooperative federalism framework mandated by Congress. Producer Association Comments at 5, JA__ ("EPA needs to recognize and account for the significant financial investments industry has made to comply with requirements of Subpart OOOO and Subpart OOOOa as it looks to

12

regulate 'existing sources' under OOOOc."); *see also* Flynn Decl. ¶¶ 8-33, JA___–___.

For decades, operators such as Continental Resources have invested, planned, and developed their operations based on the longstanding application of *State* regulations, established in EPA-approved SIPs. *Id.*; Flynn Decl. ¶8, JA___. The Final Rule turns that substantial reliance on its head, erasing States from the picture, and requiring operators to immediately begin the time consuming and costly process of adjusting their existing operations to comply with the Final Rule's presumptive national standards. For example, under EPA's presumptive standards, operators will no longer be able to rely on considerations such as remaining useful life of its facilities, or which tank batteries are covered facilities (Producer Association Comments at 43-44, JA__-__; Flynn Decl. ¶¶10-11, JA__), which also harms operators by disrupting their past and current decisions made in reliance on SIPs. This substantially impairs operators' funding and ability to allocate resources, and is already adversely affecting Industry operators' day-to-day operations. *Id.*; Flynn Decl. at ¶¶ 7-14, JA__.

When an agency changes policy, as EPA has in the Final Rule, it must "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016), (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502,

515) (2009)).   Accordingly, an agency must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns."  *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020).   If an agency changes its policy despite reliance interests, it must provide a "reasoned explanation" therefor.  *Id.* at 35.

Operators raised these concerns with EPA during the rulemaking, commenting that EPA's presumptive standards effectively remove States' ability to consider statutory factors such as the remaining useful life of a facility, and "in almost all circumstances the controls required by Section 111(b) [in the Final Rule] are the same as those being required by Section 111(d)."   Producer Association Comments at 12, JA__.   Operators have long relied upon the Clean Air Act's provisions for existing sources, including the flexibility to consider remaining useful life, to allow future retrofits to be tailored to the actual source, because in the past, "EPA has generally recognized the difference" between existing and new sources, and EPA's departure from this approach is a "thinly disguised effort to eliminate" existing sources "through excessively costly regulations."  *Id.* at 12, 45; JA __, __.

While State Petitioners touch on the Final Rule's usurpation of their authority to consider "remaining useful life" and "other factors" when regulating existing sources, this bears more examination.   States Br. at 36-37.   Section 111(d) makes it clear that standards of performance for existing sources are established *separately*

from those for new sources.  42 U.S.C. § 7411(d)(1).  Further, Section 111(d) makes it clear that EPA "shall permit" States "to take into consideration, among other factors, the remaining useful life of the existing source."  *Id.*; *see also* the title of Section 111(d) ("Standards of performance for existing sources; *remaining useful life of source*" (emphasis added).  Congress was abundantly clear that existing sources were to be regulated more flexibly than new sources – and EPA seeks to write out Congress' mandate with the Final Rule.

EPA has not provided a reasoned explanation for its decision to impose presumptive federal emissions standards on existing sources and override long-standing State regulations implemented through SIPs.  EPA has, without reasoned explanation, departed from its longstanding practice and the cooperative federalism required by Clean Air Act Section 111(d) to allow the *States* to establish standards of performance in their SIPs.  As State Petitioners commented, EPA ominously warned in the proposed rule that "it would likely be difficult for States to demonstrate that the presumptive standards are not reasonable for the vast majority of designated facilities."  86 Fed. Reg. 63,110, 63,251 (Nov. 15, 2021), JA___, ___.  EPA carried this language through to the Final Rule, asserting that if a particular model-rule provision "does not require upfront capital expenditures, then the EPA believes it would be extremely unlikely that a [S]tate could" justify a variance under 40 C.F.R. 60.24a(e)(2) "based on costs relative to remaining useful life." 89 Fed.

Reg. at 17,004, JA__.  Yet under the cooperative federalism of the Clean Air Act and the specific reservations to States under Section 111(d), EPA is not permitted to make such presumptions. EPA's major and unlawful shift in policy is not the "best" interpretation of the Clean Air Act, nor is it accompanied by any reasoned explanation or justification.

## II.    The Final Rule's BSER For Associated Gas is Not Adequately Demonstrated.

A BSER developed by EPA must "tak[e] into account the cost of achieving [any] such [emission] reduction and any nonair quality health and environmental impact and energy requirements" and be "adequately demonstrated."  42 U.S.C. § 7411(a)(1).   These provisions prevent EPA from mandating measures that impose "exorbitant," "unreasonable," or "excessive" costs. *Lignite Energy Council v. EPA*, 198 F.3d 930, 933 (D.C. Cir. 1999); *Sierra Club v. Costle*, 657 F.2d 298, 383 (D.C. Cir. 1981).

Violating these mandates, the Final Rule imposes a BSER for handling of "associated gas" from oil wells that is neither cost-justified or adequately demonstrated.   Under normal circumstances, operators will typically choose to recover and sell the associated gas generated from producing oil wells.  But, in cases where the associated gas cannot be sold (*e.g.*, when there is no sales line availability or capacity), prior iterations of both EPA and State regulations required associated

gas to be controlled through flaring (*i.e.*, burned) at a set efficiency percentage to reduce methane emissions.

In the Final Rule, EPA selected a BSER for associated gas of "rout[ing] associated gas to a sales line" that effectively prohibits flaring. 89 Fed. Reg. 16,833, JA__. Operators of a well that produces associated gas have only four options under the BSER: (1) routing (recovering) the associated gas into a sales line; (2) using the associated gas onsite as a fuel source; (3) using the associated gas for another useful purpose; or (4) reinjecting the recovered associated gas into the well or another well. 40 CFR 60.5377(b). The BSER, therefore, essentially prohibits new sources from flaring associated gas. *See* 89 Fed. Reg. at 17,053 (§ 60.5377b), JA__. These BSER requirements can only be avoided if an operator makes a "technical infeasibility" demonstration showing that all of the BSER options are technically impossible (which demonstration cannot take cost into account). 89 Fed. Reg. at 16,951, JA__.

The BSER violates Section 111 of the Clean Air Act in three key ways: (1) EPA did not consider the costs of routing associated gas to sales lines; (2) EPA did not demonstrate that routing gas to a sales line is achievable for all associated gas sources; and (3) the technical infeasibility demonstration option is arbitrary and capricious because it is unduly vague.

17

**A.    EPA did not adequately demonstrate that routing associated gas to a sales line is cost-justified or achievable.**

EPA failed to adequately demonstrate that routing associated gas to a sales line is cost-justified, instead simply assuming that because this control can be cost-effective where adequate sales line capacity is present, that it is cost-effective in all situations, even where existing sales lines lack capacity (or no sales line access is available).  Industry Br. at 43-47.

Continental Resources wishes to emphasize several discrete points.  First, Industry Petitioners arguments regarding marginal wells apply equally to all remote wells that are not connected to gas pipeline infrastructure, whether those wells produce marginal amounts of oil or not.  By only analyzing situations in which capturing associated gas is already cost-effective (i.e., where the necessary pipeline infrastructure and capacity for selling associated gas already exists), EPA specifically failed to analyze *any* situation where capturing associated gas has not already been determined to be cost effective, such as wells where there is no gas pipeline infrastructure through which to sell associated gas.  An economic analysis that intentionally excludes adverse information is fundamentally flawed, and EPA has failed to justify imposing this blanket BSER by failing to take into account wells that are not already connected to the pipeline infrastructure.

Second, EPA has defended its associated gas requirements by disingenuously arguing that no well operators "demonstrate[d] or even explain[ed] that routing to a

18

sales line or the alternatives were infeasible." 89 Fed. Reg. at 16,944, JA__.  Yet under Section 111, it is EPA's duty to show that its chosen BSER is achievable in the first instance.  As Industry Petitioners point out, EPA simply concluded "'that in situations where gas sales line infrastructure is available, there is minimal cost to owners and operators to route the associated gas to the sales line.'" *See id*. at 16,940 (quoting 86 Fed. Reg. at 63,237), JA___.  EPA admitted that circumstances at well sites can differ, which would impact this cost. *Id*.  Despite this acknowledgment, EPA then wrongly assumed that "'in *every* situation the value of the natural gas captured and sold would outweigh the[]…costs of routing the gas to the sales line.'" *Id.* (quoting 86 Fed. Reg. at 63,237) (emphasis added).  Further, as Industry Petitioners state, EPA did not analyze the costs of the other three control options (injection, use as a fuel source, or other beneficial use), instead simply allowing them because they achieve "equivalent emission reductions" to capturing associated gas. Industry Br. at 46.

This does not comply with EPA's duty to properly determine the BSER under the Clean Air Act to "tak[e] into account the cost of achieving such reduction" en route to showing a proposed control is "adequately demonstrated."  42 U.S.C. § 7411(a)(1); *see also* Industry Br. at 43, 46.  Violating these considerations, EPA eschewed its obligation to account for the costs of routing associated gas to a sales line compared to other potential BSER technologies, and instead simply concluded

19

that because routing gas to a sales line allows operators to receive a positive return where adequate sales line capacity is available, there would be minimal costs associated with the BSER. 89 Fed. Reg. at 16,940, JA__. EPA circular logic should be rejected. Further, when commentors pointed these issues out and provided statistics on the exorbitant costs to connect remote, stranded, wells to sales lines– EPA refused to change course or rework its analysis, ignoring them. *See* Industry Br. at 12 (citing to MOGA Comments at 13–14, JA__–__ (describing exorbitant costs to connect to a sales line and noting such connections are "not economically viable because the estimated reserves would not cover the initial capital investment"); Oklahoma Alliance Comments at 11, JA__); *see also* API Comments at 29-30, JA__-__; Producer Association Comments at 40, JA__.

This includes instances when operators drill modern horizontal wells in areas with legacy production and no suitable gas takeaway pipelines exist through which associated gas can be routed for sale. MOGA Comments at 13–14 (Feb. 13, 2023), JA__–__; API Comments at 6, 42-46, JA__–__. In these instances, midstream providers will not provide or invest in sales gas takeaway infrastructure until after an operator can prove sufficient volumes of associated gas will be produced to make the gas line investment economically attractive to the midstream company (not the oil well operator). *Id*. EPA excluded these comments from its evaluation, stating it "did not assess costs for existing wells that are located more than 5 miles away from

a gathering system," and justified this lack of analysis by claiming States could explore the "possibility of invoking" remaining useful life considerations in these instances.  89 Fed. Reg. at 16,947, JA__.  Yet EPA admitted "it would likely be difficult for States to demonstrate" such factors are justified under the Final Rule. 86 Fed. Reg. at 63,251, JA__.

Since EPA did not take this into account, the Final Rule will require operators to cease or curtail production where gas sales infrastructure and capacity is not available, and with no certainty that such infrastructure will ever be provided by a midstream operator. In addition to lost production, this causes additional significant economic losses because operators are subject to contractual obligations to produce oil from the wells, and may be subject to contractual penalties for failing to meet those obligations.  Thus, the Final Rule puts operators in an untenable situation, disrupting contractual commitments and business operations, and imposing significant costs.  MOGA Comments at 13–14, JA__–__; API Comments at 6, 42-46, JA__–__; 89 Fed. Reg. at 16,940, JA__ (only analyzing situations "where gas sales line infrastructure is available").  Further, EPA acknowledged receipt of comments "that objected to the proposal to require a demonstration of infeasibility . . . in instances when the primary option (*e.g.*, routing the associated gas to a sales line, using it as onsite fuel or for another beneficial purpose, or injecting/reinjecting it) is unavailable," yet still refused to analyze feasibility in those circumstances.  89

21

Fed. Reg. at 16,950, JA__.   Instead, EPA offered only a *temporary* offramp –
providing operators *temporary* flaring allowances that do not remedy the stark fact
that the BSER chosen by EPA is not achievable in many circumstances. [5]

The Final Rule only allows operators to avoid routing associated gas to a sales
line where they show it is "technically infeasible" (or choose one of  the other three
"equivalent" BSER options).  89 Fed. Reg. at 17,053-17,054, JA__–__.   However,
the operator cannot take costs into consideration in the technical feasibility analysis
because EPA has already assumed that operators would build any necessary sales
line infrastructure, despite their lack of expertise, control, or cost ability to do so.  In
removing cost as a consideration, and effectively concluding that sales pipeline
infrastructure is a no-cost technology, EPA has rendered the technical feasibility
showing meaningless.

Ignoring these real-world problems demonstrating its chosen BSER is not
achievable, EPA disingenuously cites comments by the American Petroleum
Institute in the Final Rule out of context in support of its associated gas requirements,
in which API explained that routing associated gas to a sales line is a "standard
business operations for thousands of wells producing a vital energy resource

---

[5] This Court has severed issues relating to temporary flaring provisions for
associated gas, which comes down to a dispute over the time period temporary
flaring is allowable under the Final Rule.  Order, Doc. 2073084 (D.C. Cir., Sept. 4,
2024). That issue is distinct from whether the BSER for routing associated gas to a
sales line is cost-justified or achievable in the first instance.

throughout the country." 89 Fed. Reg. at 16,944, JA__ (citing to API Comments at 30, JA__). Yet EPA ignored the full context of the API comments, which explained in more detail that the associated gas requirements were "exceptionally problematic" and created "tremendous administrative burden" because they (1) ignored that operators recover associated gas whenever it is economically feasible to do so; and (2) thus did not contemplate situations where associated gas could otherwise not be recovered, such as when pipeline takeaway capacity is temporarily inadequate due to midstream capacity limitations. API Comments at 30, JA__. Further, the American Petroleum Institute pointed out that EPA had already acknowledged that situations do occur outside the control of operators where routing associated gas is not feasible. *Id.* (citing 87 Fed. Reg. 74,702, 74,780 (Dec. 6, 2022), JA__). As such, API supported provisions allowing consideration of economic viability in determining whether capturing associated gas would be required, an alternative that EPA unreasonably rejected. *Id.*

Despite overwhelming evidence disproving the validity of EPA's cost assumptions (and thus achievability assumptions) for the chosen BSER of routing associated gas, EPA stuck its head in the sand and moved forward anyway. This callous disregard of its duty to show that its determined BSER was "adequately demonstrated" and "achievable" is a violation of Section 111 of the Clean Air Act and renders the Final Rule arbitrary and capricious.

23

**B.    The technical feasibility demonstrations for associated gas under the Final Rule are arbitrary and capricious.**

Industry Petitioners briefly touch on the technical feasibility demonstrations which allow the subset of wells constructed between December 6, 2022 and May 7, 2026 to route associated gas to a control device (Industry Br. at 47) to avoid the requirement to route associated gas for sale.  However, in addition to being unlawful because the technical feasibility demonstrations are not allowed to consider cost, they are also arbitrary and capricious.

To avoid associated gas routing requirements, the Final Rule requires that operators prove to EPA that it is "technically infeasible" to route into a gas gathering flow line or collection system to a sales line, and that it is technically infeasible to use any of the three other, untested and undemonstrated, alternate options use as an onsite fuel source, use for other beneficial purposes, or reinjection.  89 Fed. Reg. at 16,887, JA__.  As discussed above, EPA prohibits consideration of cost in this analysis, rendering it unreasonable, arbitrary and capricious in the context of any commonly understood concept of feasibility.  Further, EPA admits that the third prong—proving that there is no other useful purpose for the associated gas—is unbounded.  *Id.* ("The final rule does not specify the 'other useful purpose' solutions that must be evaluated, but it is the responsibility of the owner and operator, along with the qualified professional . . . to ensure that the list of options evaluated is comprehensive to address technically viable solutions.").

24

This language is so vague that an unlimited amount of "useful purposes" would have to be evaluated to effectively demonstrate technical infeasibility, giving EPA unbound discretion to deny any such demonstration.  It gives no clarity to operators, who could be subject to both civil penalties and criminal charges for technical infeasibility demonstrations that EPA determines are inadequate (89 Fed. Reg. at 16,952, JA__). Yet operators must make these determinations contemporaneously with upset conditions (e.g. during equipment failures or when sales line capacity is temporarily unavailable) while only submitting the infeasibility determinations to EPA at the time of annual reports (*Id.* at 17,054, JA__), significantly increasing their potential liability for civil and criminal penalties once EPA reviews the technical infeasibility demonstrations under the Final Rule's amorphous standards.  As such, the technical infeasibility demonstration requirements are not "sufficiently specific that a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, would have fair warning of what the regulations require" and are arbitrary and capricious and void for lack of due process. *Freeman United Coal Mining Co. v. Federal Mine Safety & Health Review Commission*, 108 F.3d 358, 362 (D.C. Cir. 1997).

III.    **The Final Rule's Legally and Practicably Enforceable Emissions Limits for Storage Vessels are Arbitrary and Capricious.**

In addition to Industry Petitioners' argument regarding EPA's utter lack of reasoned decisionmaking in promulgating the "legally and practicably enforceable" criteria for storage vessels (Industry Br. at 28-35), EPA also failed to provide an adequate cost justification for these provisions.

EPA stated that the legally and practicably enforceable limits for storage vessels only apply to new sources, or existing sources that are modified or reconstructed after December 6, 2022, including in State with approved SIPs and pre-Final Rule enforceable limits for storage vessels. 89 Fed. Reg. at 16,977, JA__. EPA then stated "that 11 [S]tates already required control devices for storage vessels, including both Texas and New Mexico," such that the EPA could subtract the storage vessels in these States ''from the overall count of storage vessels that would be subject to the final rule" for purposes of the analysis of the costs of this provision. (89 Fed. Reg. at 16,977, JA__).  This was no small number of sources EPA removed, but rather, per EPA's own words, "represented 95 percent of the total production of crude oil and condensate in the U.S." at the time.  78 Fed. Reg. 22,126, 22,131 (Apr. 12, 2013).   However, EPA then asserted in the Final Rule that it had not made a "'determination' as to the adequacy of" those existing State permitting regulations (89 Fed. Reg. at 16,978, JA__).  So, EPA acknowledged that existing storage vessel facilities with controls already installed under State programs

(representing 95 percent of the total production of crude oil and condensate in the U.S.) would likely be subject to the legally and practicably enforceable limits provisions, but excluded them from its cost-benefit assessment of the Final Rule. This complete and utter failure to assess the costs of the legally and practicably enforceable limits provisions of the Final Rule is not reasoned decision making, and is arbitrary and capricious.

Second, even ignoring that EPA wrongly excluded approximately 95% of the covered tanks from its analysis, EPA's Regulatory Impact Analysis shows that the costs of the legally and practicably enforceable limits provisions are 4 times that of any predicted "climate benefits", and generate *de minimis* product recovery. Regulatory Impact Analysis at 164 (Table 5-5), JA__.   Even ignoring that EPA's unreasonable use of a social cost of carbon metric to justify these storage vessel provisions is not lawful (States Br. at 51-55), a cost to benefit ratio of 4:1 is not reasoned decisionmaking.  The legally and practicably enforceable limits provisions of the Final Rule are therefore arbitrary and capricious.

## IV.    The Final Rule's Super Emitter Program is Unlawful and Implicates Serious Due Process Concerns for Regulated Parties.

In addition to State Petitioners' and Industry Petitioners' statutory arguments regarding EPA's exceedance of its statutory and constitutional authority in promulgating the Super Emitter Program in the Final Rule, the Final Rule poses significant operational burdens and due process concerns for operators.

27

Under the Final Rule, third-parties may submit reports of "super emitter" events to EPA within 15 days of observation. 89 Fed. Reg. at 17,050 (§60.5371b(c)(9)), JA__. EPA then has an unlimited amount of time to review and verify the third-party notification before sharing it with the operator and publicly posting the alleged "super emitter" event online. *Id.* (§60.5371b(c)). Therefore, significant amounts of time could pass before an operator such as Continental Resources could be notified of the alleged event, delays that could increase both potential emissions and fines in the event of verified excess emission events. These outcomes are not only inconsistent with the intent of the Clean Air Act Section 111 monitoring provisions, but they also pose significant due process concerns.

First, operators will be obligated to investigate and respond to super emitter notifications under the threat of penalties and injunctive relief regardless of whether the alleged super emitter events are remotely valid or involve the operator's facilities. *See* API Comments at 112, JA__ (describing how stationary sources without affected facilities covered by the Final Rule could still be reported as super-emitter events). Second, the super emitter notification will be made public, before operators have the opportunity to rebut the notification by showing it was either not from one of their facilities or was an otherwise allowable emission event – causing

potential reputational harm through assumed non-compliance by nature of the public notice.[6]

Third, the Super Emitter Program is clear that when responding to a super emitter notification, operators are subject to both civil and criminal penalties:

> . . . the certification submitted herein is true, accurate, and complete. *I am aware that knowingly false statements may be punishable by fine or imprisonment.*

*See* 89 Fed. Reg. at 17,051 (§ 60.5371b(d)(3)) (emphasis added), JA__.  EPA has placed civil and criminal liability under the Final Rule in the hands of deputized, third-party actors, something never intended nor authorized by Congress in the Clean Air Act.  Further, EPA does so placing the burden on operators to respond to these third-party notifications, which notifications EPA does not take responsibility for beyond determining the third-party report is complete and "does not *contain information* that the EPA finds to be erroneous or inaccurate."  89 Fed. Reg. at 17,048 (§ 60.5371b) (emphasis added), JA__.  Notably, this is *not* a determination that the notification covers a *bona fide* super emitter event, just that emissions in some form (whether allowable under the Final Rule or not) were observed.

---

[6] Operators will also face immediate administrative burdens from super-emitter reports, wasting valuable resources responding to meritless reports.  The remote sensing technology allowed by "qualified" super emitter third-party notifiers will undoubtedly detect non-fugitive emissions and allowable emissions events such as lawfully permitted operations (e.g. emission events allowable under the Final Rule). *See* API Comments at 112, JA_ .

Operators thus face reputational harm from reported events that in many instances will not constitute any violation under the Final Rule.  Further, even if Congress had delegated to EPA the authority to pawn off its enforcement authority on third-parties (which it has not), the Super Emitter Program places the burden on disproving meritless reports (for which EPA takes little agency beyond a brief accuracy check) on operators, a process antithetical to due process and the separation of powers.

## <u>CONCLUSION</u>

For the reasons explained above, and in State Petitioners and Industry Petitioners Opening Briefs, Continental Resources respectfully requests that the Court vacate the Final Rule and remand it to EPA's further consideration consistent with the Court's decision.

Dated:  December 16, 2024

Respectfully submitted,

CONTINENTAL RESOURCES, INC.


<u>s/ Paul M. Seby</u>
Paul M. Seby
Greenberg Traurig, LLP
1144 15th Street, Suite 3300
Denver, CO 80202
Telephone:  (303) 572-6584
Fax:  (303) 572-6540
sebyp@gtlaw.com


**Counsel for Intervenor Petitioner**
**Continental Resources, Inc.**

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the type-volume limitation of the Court's September 4, 2024 briefing order, ECF Doc. 2073084, because it contains 6,786 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the requirements of Fed. R. App. P. 27(d)(1)(E), 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  December 16, 2024                 CONTINENTAL RESOURCES, INC.


*s/ Paul M. Seby*
Paul M. Seby
Greenberg Traurig, LLP
1144 15th Street, Suite 3300
Denver, CO 80202
Telephone:  (303) 572-6584
Fax:  (303) 572-6540
sebyp@gtlaw.com


***Counsel for Intervenor Petitioner***
***Continental Resources, Inc.***

32

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 16th day of December 2024, a copy of the foregoing brief was served electronically through the Court's CM/ECF system on all ECF-registered counsel.


Dated:  December 16, 2024              CONTINENTAL RESOURCES, INC.


                                                        *s/ Paul M. Seby*
                                                        Paul M. Seby
                                                        Greenberg Traurig, LLP
                                                        1144 15th Street, Suite 3300
                                                        Denver, CO 80202
                                                        Telephone:  (303) 572-6584
                                                        Fax:  (303) 572-6540
                                                        sebyp@gtlaw.com


                                                        ***Counsel for Intervenor Petitioner***
                                                        ***Continental Resources, Inc.***